IN THE UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF ARKANSAS
HELENA DIVISION

IN RE: ROBERT W. RICHMOND, Debtor                    CASE NO.: 2:07-bk-15035
                                                                      CHAPTER 7

HELENA CHEMICAL COMPANY                                           PLAINTIFF

v.                                    AP NO.: 2:08-ap-01134

ROBERT W. RICHMOND                                        DEFENDANT/DEBTOR

<u>MEMORANDUM OPINION AND ORDER</u>

On March 28, 2008, Helena Chemical Company ("Helena Chemical") filed its *Complaint Under 11 U.S.C. §727 Requesting Debtor be Denied Discharge, or Alternatively, that Debt to Helena Chemical Company be Excepted from Discharge Under §523* ("Complaint"). The debtor, Robert W. Richmond, filed an answer. The parties tried this adversary proceeding the week of January 4, 2010, in Helena, Arkansas. At the parties' request, the court held the record open until January 29, 2010, to include the transcript testimony of five additional witnesses. Thereafter, the court closed the record and took the matter under advisement. For the reasons stated below, the Complaint is granted in part and denied in part. The debtor is denied his discharge generally and specifically as to the debt owed Helena Chemical. A judgment will be entered consistent with the findings and conclusions stated herein.

**I. Introduction**

Helena Chemical attacks the debtor's discharge based on both the debtor's own actions and the imputed actions of his alleged agent, James Victor Richmond ("Vic Richmond"). Vic Richmond is the debtor's son. The scrutinized activities relate to a number of east Arkansas farming operations involving the debtor, Vic Richmond, family members, and close associates.

1

The critical events concern Helena Chemical's spring 2006 credit to Richmond related entities. Helena Chemical contends that its 2006 credit had, in addition to typical credit terms, two conditions: first, that the Richmond entities would obtain necessary operating, or crop, loans, and, second, that the Richmond entities had paid in full their 2005 indebtedness to Helena Chemical.

As part of its credit analysis, Helena Chemical assumed that the 2006 operating loans would not be used to pay the 2005 Helena Chemical debt. Concurrently, the bank making the Richmond entities their 2006 operating loans expected that the 2006 credit would not be used to pay 2005 operating loans or 2005 Helena Chemical debt. The Richmond entities,[1] contrary to these assumptions and understandings, used their 2006 crop loans to pay their 2005 Helena Chemical and crop loan debts. The effect was to substantially diminish the borrowers' ability to effectively farm in 2006 and adequately address their 2006 debt.

## II. Jurisdiction

This court has jurisdiction over this matter under 28 U.S.C. §§1334 and 157. This is a core proceeding under 28 U.S.C. §157(b)(2)(I) and (J). The following opinion constitutes findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052.

---

[1] Although the debtor guaranteed the debt of only one entity, by necessity and because of their inter-related activities, this opinion will reference a number of Richmond controlled entities.

2

### III.  Facts

Helena Chemical supplies fertilizer, seed, and related products to farmers.  It has separate

sales and credit divisions; the local presence emphasizes sales.  Typical sales terms are net 30

days.  Predicated on a credit application process, farmers may obtain extended credit that, while

having defined due dates, in practice conforms to the cyclical rhythms of farming.

Vic Richmond is at the epicenter of the controversy between the debtor and Helena

Chemical.  Helena Chemical contends that Vic Richmond is the agent for, and operator of, a

number of farming entities that he controls, although others– including the debtor– are the

owners, partners, or farm managers.

There are no less than twenty-three Richmond related farming entities involved in this

case[2] (Ex. 189), most owing their existence to government subsidy regulations.  The three

principal and pertinent entities are Richmond & Company, a general partnership ("Richmond

Company"), JSR & Company, a general partnership ("JSR"), and Richmond Gin, LLC

("Richmond Gin").

---

[2] Richmond and Company is a general partnership comprised of the following partners: Paulab Ag, Inc.; Billb Ag, Inc.; Bobr Ag, Inc.; Vkeith Ag, II, Inc.; Vmona Ag, II, Inc.; Kpaula Ag, II, Inc.; Rtaylor Ag, II, Inc.; and Kjim Ag, II, Inc.

JSR & Company is a general partnership comprised of the following partners: Sjill Ag, II, Inc.; Lauraj Ag, II, Inc.; Ekatie Ag, II, Inc.; Vcase Ag, II, Inc.; Eliz Ag, II, Inc.; and Eheather Ag, II, Inc.

Other Richmond related entities include the following: Richmond Gin, LLC; JSR, LLC; RDFarm Group; DVFarm Group; FARMMGR, LLC; 2Win Farms, LLC; and FARMPAY, LLC.

*A.  Richmond Company*

Paulab Ag, Inc., Billb Ag, Inc., and Bobr Ag, Inc. formed Richmond Company in March, 2003. (Ex. 1.)  Vic Richmond's previous farming venture, Richmond Farming, was in decline; Vic Richmond was insolvent and could not personally obtain credit.  He had outstanding debt from his previous farming ventures and ongoing issues with the Internal Revenue Service ("IRS").

The debtor, as president of Bobr Ag, Inc., personally signed the Richmond Company Partnership Agreement ("Partnership Agreement"), originally consisting of the three corporate partners named above. (Ex. 1.)  The debtor also owned a half-interest in the other two original partners, along with Paula Knight ("Knight") and William Vangilder, respectively the bookkeeper and a farm manager for one or more of the Richmond entities. (Ex. 189.)  Richmond Company farmed cotton in Jefferson County, Arkansas.

The Partnership Agreement names the debtor as the manager, states that a successor can be appointed if he is "unable or unwilling" to serve, and that he may be removed by a majority vote. (Ex. 1 at 2-3.)  The manager had extensive and specifically enumerated duties, including preparing an annual budget, determining the crop loan needs each year, choosing a lending institution, applying for necessary loans, and entering into financial agreements with lending institutions. (Ex. 1 at 3-4.)  Further, the Partnership Agreement designated the debtor as its representative for all matters involving the Farm Service Agency ("FSA") and the IRS. (Ex. 1 at 4.)  These financial responsibilities are in addition to the debtor's actual farm management obligations. (Ex. 1.)

In February 2004, the initial three partners amended the Partnership Agreement to

4

include several Richmond related entities. Vaughn Knight, Paula Knight's son and debtor's counsel, assisted in the preparation of the First Amendment to Partnership Agreement. The partners designed the amendment in light of government subsidies and FSA rules.

Throughout its history, the Richmond Company partnership and partners ignored most of the formalities– financial, record keeping, meetings, and otherwise– set forth in the Partnership Agreement and customary to the operation of a business. The debtor actively participated in, or passively and knowingly permitted, this pattern and practice.

The reasons for designating the debtor as Richmond Company's manager are vague. Vic Richmond testified simply that someone had to be personally responsible, and that the debtor was the "natural choice." At varying points in his testimony, Vic Richmond gave conflicting testimony concerning the debtor's ability to run a farming operation: the debtor was capable of running a farm; conversely, the debtor was unsophisticated and age had diminished his mental capabilities; the debtor, however, was sufficiently coherent to understand both his delegation of authority and the import of the financial documents he either signed or permitted others to sign on his behalf.

Regardless, the debtor abdicated and delegated the majority of his management responsibilities to Vic Richmond. The parties never documented this delegation or the unlimited and unrestricted scope of Vic Richmond's authority. Vic Richmond occasionally consulted with the debtor but basically performed all the management functions himself. The debtor did, however, negotiate some leases on behalf of Richmond Company due to his prior history with the landlords. The debtor also picked up mail, ran errands, prepared labor sheets, picked up and dropped off documents, occasionally signed financial documents, and knew how much and from

5

whom Richmond Company obtained credit.  On some documents, the debtor signed his own name; on other occasions, Vic Richmond signed the debtor's name; his authority was solely verbal and is not reflected on the face of any document.

### B.  JSR

Six corporations formed JSR in March 2005. (Ex. 51.)  The debtor was not an equity owner of any of the partners. (Ex. 189.)  The equity owners were either members or friends of the extended Richmond family.  Jill Richmond, Vic Richmond's wife, served as JSR's manager; she delegated all of her management authority to Vic Richmond.  Jill Richmond lacked the necessary skills to run a farming operation.  Jill Richmond and the partners completely ignored standard and typical partnership formalities.  The partners structured JSR, and its corporate partners, solely to take full advantage of government subsidies.  JSR farmed principally cotton in Phillips County, Arkansas.

### C.  Richmond Gin

Members of the Richmond family formed Richmond Gin in 2005, though there was testimony that the operative date was actually in June 2006. *See* Exhibit 189, Richmond Gin's partners as of 2006, though Vic Richmond testified that Richmond Gin was formed in spring, or possibly June, 2005.  Richmond Gin also filed a 2005 tax return. (Ex. 160.)  Richmond Gin leased a cotton gin from an entity operated by Larry McClendon and ginned principally for Richmond Company and JSR.  Vic Richmond is the president of Richmond Gin. (Ex. 193 at 5047.)

6

### D.  Helena Chemical Credit History Prior to 2006

Starting in 1984, Vic Richmond had a credit relationship with Helena Chemical, both individually and through various farming entities.  Richmond Company first obtained credit from Helena Chemical in June 2003. (Ex. 9.)  Vic Richmond worked principally with Curtis Hopkins at Helena Chemical.

Although Helena Chemical considered Vic Richmond the principal representative and decision maker for Richmond Company, the original Application for Credit ("Application") in 2003 bears the debtor's signature[3] and lists the debtor as the manager. (Ex. 9.)  The debtor delegated the financing arrangements to Vic Richmond; the debtor was aware that Vic Richmond was acting in this capacity.[4]  Helena Chemical representatives routinely dealt with Vic Richmond as the "grower" and had only limited interaction with the debtor, rarely as the manager of Richmond Company.  Curtis Hopkins testified that he met with the debtor on one occasion to confirm that he understood what was involved in managing approximately 5000 acres of farmland prior to signing a personal guaranty.

The initial Application served as the basis for opening an account and for annual credit consideration thereafter.  Each year, Helena Chemical required updated credit information, including a balance sheet and crop, acreage, and expense projections.  Although the credit was due after the crops were in, the parties had an understanding that the credit would generally be

---

[3] Vic Richmond is certain he did not sign his father's name but is unsure if the signature belongs to his father.  The debtor testified that the signature, though his name, was not his.  The debtor noted that it may have been signed by Knight on his behalf as she signed his name on occasion.

[4] Vic Richmond acted in a similar manner for JSR.

7

paid the following spring because of the cyclical nature of cotton sales.

On February 20, 2004, the debtor supplied Helena Chemical with a financial statement, termed a Balance Sheet ("2004 Balance Sheet"). (Ex. 12.)  The debtor personally guaranteed Richmond Company's Helena Chemical debt through a continuing Guaranty Agreement dated April 5, 2004. (Ex. 11.)

The 2004 Balance Sheet is notable in several regards.  First, Vic Richmond not only filled out the form, but he also signed the debtor's name; his authority to do so is not apparent on the face of the document.  Second, Vic Richmond supplied most of the information on the 2004 Balance Sheet, except some "personal" information from the debtor.  Third, the debtor authorized Vic Richmond to fill out the form and sign his name, rather remarkable given the obligation incurred.  In connection with its request for credit, Richmond Company also supplied Helena Chemical with a Balance Sheet dated February 20, 2004, also completed by Vic Richmond.  Vic Richmond executed the debtor's name on the document with the debtor's knowledge and consent. (Ex. 13.)

The debtor did sign his name to both a May 20, 2004 Mortgage of Real Property (Ex. 21) and a May 2004 Security Agreement. (Ex. 14.)  The Security Agreement is between Helena Chemical, the debtor (though he signs as "Richmond & Co. By Robert Richmond, Mgr"), and the three initial Richmond Company general partners.  An attached list of equipment contains a heading which states, "Richmond and Company Farms As of 01/21/04."  Curtis Hopkins was provided with this list of equipment, and he assumed the list was Richmond Company's equipment.  As such, Helena Chemical took a lien on the listed equipment.  In actuality,

8

Richmond Company did not own any equipment.[5]  Vic Richmond supplied Helena Chemical with the equipment list, and the debtor inferred to Curtis Hopkins that he owned the equipment that the farming entities would use.  Apparently, in 2005, Helena Chemical did not clarify ownership of the equipment.

Traditionally, Helena Chemical would not extend credit in the spring of any year if the prior year's credit had not been paid in full.  This was the case for the 2005 crop year loan.  The debtor supplied a personal Balance Sheet on April 23, 2005, in connection with the 2005 Helena Chemical credit. (Ex. 23.)  Again, Vic Richmond provided most of the financial information, other than a few personal items supplied by the debtor.  The debtor signed his personal 2005 Balance Sheet and was aware that Richmond Company was applying to Helena Chemical for credit.  Again, the debtor executed a Guaranty Agreement (Ex. 26), actually signed by Vic Richmond without notation of the agency relationship, but with the debtor's knowledge.  The debtor signed and provided Helena Chemical a Richmond Company 2005 Balance Sheet (Ex. 22) prepared by Vic Richmond, with the debtor's authorization.

This was the pattern for both Richmond Company and JSR in the years prior to the 2006 credit. (Exs. 59-61, 71.)  On at least one occasion, a Helena Chemical representative was aware that Vic Richmond signed the debtor's name to a Helena Chemical document and thus had some idea of the agency relationship. (Ex. 71.)  Curtis Hopkins, a credit manager with Helena Chemical, testified that he had dealt with Vic Richmond in the years prior to the formation of Richmond Company and thereafter.  Curtis Hopkins considered Richmond Company and JSR

---

[5] The 2006 Richmond Company Balance Sheet reflects machinery and equipment as "all leased." (Ex. 28.)

collectively in making his credit decision, though each entity engaged in a separate application and loan process. Curtis Hopkins was aware that Vic Richmond was a beneficiary of the partnership's income, and he dealt principally with Vic Richmond. Curtis Hopkins asked to meet the debtor to get a feel for his knowledge and competency to sign a guaranty. He derived some comfort from the fact that the debtor could manage 5000 acres and personally owned several hundred acres. Curtis Hopkins only saw the debtor occasionally; he considered the debtor and Vic Richmond the decision makers, with Vic Richmond doing all the talking.

*E. 2006 Helena Chemical Credit*

To operate effectively, JSR and Richmond Company required two principal extensions of credit: first, a line of credit from Helena Chemical to purchase seed, fertilizer, and related farm necessities and, second, an operating (or crop) loan from a bank. The two credit lines were complementary and equally necessary for the farm entities to operate. Due to the cyclical nature of farming, the current year's application process and payment for the prior year's credit usually coincided in the spring. This was the case in 2006 when the entities applied for their 2006 credit with their 2005 debt still partially due and owing.

Again, Vic Richmond supplied the necessary Richmond Company financial information to Helena Chemical.[6] Vic Richmond prepared a Richmond Company Balance Sheet dated March 20, 2006 ("RC 2006 Balance Sheet"), which reflected total assets of $1,514,825, total

---

[6] Vic Richmond supplied similar material for JSR. The debtor neither owned, guaranteed debt, nor operated JSR. JSR is referenced only insofar as some of its activities are interrelated with that of Richmond Company.

10

farm liabilities of $1,145,175, and $369,650 in farm equity.[7] (Ex. 28.)  The debtor authorized Vic

Richmond to apply for the 2006 Helena Chemical credit and was aware of his efforts.  Curtis

Hopkins, testifying on behalf of Helena Chemical, stated that he absolutely relied upon the RC

2006 Balance Sheet, while recognizing that generally a balance sheet is a snapshot in time

subject to subsequent events.  Curtis Hopkins engaged in some verification of the figures

outlined in the RC 2006 Balance Sheet.  He was only authorized to make superficial credit

inquires; he indicated that it was difficult to verify notes and accounts receivable as he was not

permitted to contact the individuals.  The FSA only verified eligibility, not the amount.  Curtis

Hopkins was principally looking for material departures from the balance sheet; he found none.

As stated above, Vic Richmond prepared the RC 2006 Balance Sheet, which reflected

total assets of $1,514,825, total farm liabilities of $1,145,175, and $369,650 in farm equity. (Ex.

28.)  With the debtor's consent and knowledge, Vic Richmond signed the debtor's name to the

RC 2006 Balance Sheet and published it to Helena Chemical on or about April 10, 2006.

The RC 2006 Balance Sheet is materially false and misleading, specifically:

-Cash and equivalents of $218,700.  Vic Richmond was unable to substantiate this figure

either through cash alone or an aggregate of cash plus vague, unspecified, and

insufficiently documented accounts receivable, program payments, or rebates.  A

reconstruction of Richmond Company's records[8] reflects a then cash balance on hand of

---

[7] Helena Chemical also contends that financial information concerning crop acreage was misrepresented but failed conclusively to meet its burden that the debtor made misrepresentations in this regard.

[8] Utilizing documentation provided by Richmond Company, Stephen Orr, an expert whose testimony is detailed infra, created a general ledger and reconstructed the books and records of Richmond Company.

$40,623.63. (Exs. 102 at 690-91, 104 at 960, 106 at 1024-25, 108 at 1152, and 186H.)

-FSA 2005 receivables are overstated by $41,228. (Ex. 186H.)

-Inter-company advances of $67,756.33 are ignored. (Ex. 186H.) This would generally be an improvement on the asset side. The Richmonds, however, demonstrated no propensity to properly account for and collect inter-company debt. Thus, this figure actually represents an adverse financial consequence to Richmond Company.

-05 Crop- Inventory & Receivable(s) of $279,500. Vic Richmond could not provide specifics that would justify or support this entry, either as a rebate (Richmond Gin had never paid Richmond Company a rebate) or as "ccp" payments, which were already allocated on the asset side. The Helena Chemical forensic accountant, discussed below, determined that this figure was overstated by $182,941.23. (Ex. 186H.)

-Account and notes receivable of $165,600. Other than suggesting that he collected "a lot of it," Vic Richmond could not provide specifics or substantive detail that would support or justify this figure. Helena Chemical's forensic accountant found no record or evidence justifying this figure. (Ex. 186H.)

-Richmond Company reported Other Current Assets (06 Inputs) of $236,400. The forensic accountant could find no record or evidence justifying this figure. (Ex. 186H.)

-2006 FSA payments of $320,000 were overstated by $133,426. (Ex. 186H.)

-Inter-company liabilities of $127,000 are ignored. (Ex. 186H.)

There is a second March 20, 2006 Richmond Company balance sheet (Ex. 30) containing figures frequently at odds with the RC 2006 Balance Sheet. The parties dispute whether the RC 2006 Balance Sheet was just a working document or ever provided to Helena Chemical. Curtis

12

Hopkins testified that he reviewed the RC 2006 Balance Sheet at the time credit was extended. The court finds that Helena Chemical did have, and relied upon, the RC 2006 Balance Sheet. (Ex. 28.)

The debtor also supplied his personal Balance Sheet dated March 22, 2006 ("2006 Balance Sheet") (Ex. 29) bearing a fax date of April 10, 2006, to Helena Chemical. Vic Richmond signed the debtor's name. His authority is not documented or noted on the document's face. Helena Chemical did not establish that the debtor's 2006 Balance Sheet was materially false insofar as reliance thereon is concerned; the assets reflected on the 2006 Balance Sheet, however, establish a baseline inconsistent with the debtor's bankruptcy schedules.

-EQUIPMENT: On his 2006 Balance Sheet, the debtor reported total intermediate farm assets of $408,250, comprised of three figures: $83,400 in vehicles (trucks, etc.), $76,350 in other vehicles, and $248,500 in machinery and equipment, all as of March 22, 2006, and all as against total intermediate farm liabilities of $20,850. The debtor filed his chapter 7 on September 13, 2007; his personal property schedule totals $50,747.67 (Ex. 197 at 5114), comprised in pertinent part of $1000 in machinery, $31,100 in farming equipment and implements, and $3900 in vehicles. (Ex. 197 at 5111-14.) These assets are listed as jointly held on his bankruptcy schedules; the 2006 Balance Sheet does not reflect joint ownership. The debtor was unable to explain the significant diminution of his intermediate farm assets between March 22, 2006, and the date of filing, September 13, 2007, a period of eighteen months. On his Statement of Financial Affairs, the debtor discloses that on September 10, 2007, he transferred his one-half interest in seventeen items of equipment, including ten vehicles, for $3100. The transfer was to 2Winfarms,

13

LLC, an entity owned by the debtor's other son, Vince Richmond, and the debtor's granddaughter, Laura Jill Richmond, established solely to own and lease equipment. Vince Richmond testified to purchasing property on behalf of 2WinFarms, LLC, but he never directly referenced the equipment sold by the debtor. He stated that he purchased some equipment "later in the summer" for less than $10,000 because he had to pay off Ford Motor Credit. The debtor's schedules reflect solely the September 10, 2007 transaction– nothing else between the 2006 Balance Sheet and filing. The debtor exempted a truck and utility trailer valued in the aggregate at only $1250. Also, the debtor listed First Bank of the Delta ("Delta Bank")[9] and Helena Chemical as secured by the same miscellaneous equipment valued at $31,100, the same $31,100 in farming equipment and implements listed on his personal property schedule. His Statement of Financial Affairs does not disclose any other Delta Bank transaction in the two years prior to bankruptcy. (Ex. 197 at 5117 and 5154, Question 10.) The debtor's Chapter 7 Individual Statement of Intention discloses that the collateral would be surrendered to Delta Bank and Helena Chemical. This collateral is disclosed and valued on the personal property schedule at $31,100; it and the sale to 2WinFarms, LLC do not explain the loss of the substantial remaining equity.

-LAND: The debtor's 2006 Balance Sheet reflected long-term farm assets of $1,130,250, comprised of a 612 acre tract worth $918,000, improvements of $147,250, and other long-term assets of $65,000. (Ex. 29.) The only disclosed obligation against long-term

---

[9] First Bank of the Delta was previously known as First National Bank of Phillips County and is presently known as Southern Bancorp.

assets was a MONY mortgage of $442,000 on the 612 acre tract. (Ex. 29.)  On his

Schedule A, the only real property interest the debtor lists is a $12,500 value in his

homestead owned jointly with his wife. (Ex. 197 at 5110.)  The debtor discloses a

transfer on June 25, 2007, of his one-half interest in the 606 acres[10] for $20,000. (Ex. 197

at 5154.)  Again, the transferee is 2Winfarms, LLC.[11]  The purchaser paid the debtor his

$20,000 but has yet to pay the debtor's wife an equal amount.  The debtor and his wife

transferred approximately $476,000 in equity to an LLC owned by their son and

granddaughter for a total of $40,000, half of which has not been paid.  The debtor

testified that at or about the time he filed bankruptcy, he may have pledged the same

property to Delta Bank to help it, in an unspecified manner, with bank examiners.

Regardless, that transaction is not reflected on his schedules, including a transfer for

security within two years of filing.  The debtor's Schedule D also reflects a secured claim

to Rabo AgriFinance on two tracts, 406 and 194 acres, with debt of $266,655.53 and

$153,260.67 respectively, but, again (1) the debt is not listed on the debtor's 2006

Balance Sheet, and (2) there is no disclosure of any transfer for security in the period

from his 2006 Balance Sheet to the filing of his petition. (Ex. 197 at 5154.)  The debtor,

in his Chapter 7 Individual Debtor's Statement of Intention, ambiguously references

---

[10] The court may infer that the difference between the 606 and 612 acre descriptions is the homestead carved out for the debtor, as the original 2006 Balance Sheet does not have a separate entry for the homestead.

[11] The debtor's schedules reflect that the property was transferred to 2Winfarms, LLC. However, the testimony of Vic Richmond and the debtor is that the land was possibly transferred to TLM Land, LLC, not 2Winfarms, LLC.  Since the testimony presented at trial does not correspond to the debtor's verified schedules, the court, similar to Vic and Robert Richmond, is uncertain who now owns the 606 acres of land but concludes that the owner is 2Winfarms, LLC.

Rabo AgriFinance but fails to disclose his intention. (Ex. 197 at 5163.)

The debtor also supplied Helena Chemical his personal Guaranty dated June 5, 2006. (Ex. 36.)  Vic Richmond signed the debtor's name.  Vic Richmond testified that he did so with the debtor's consent; the agency relationship is not in writing or noted on the face of the document.

The debtor was aware of Vic Richmond's efforts to obtain credit from Helena Chemical in 2006 but, by his own admission, signed whatever was put in front of him.  He did not verify the amounts placed on the balance sheets given to Helena Chemical and was uncertain if he even looked at the final drafts.  Curtis Hopkins noted and relied upon the approximately one million dollar figure in total farm equity reflected on the debtor's 2006 Balance Sheet.  The debtor's total farm equity, combined with the $369,650 equity figure reflected on the RC 2006 Balance Sheet (Ex. 28), gave Curtis Hopkins some comfort that the farm operation could obtain financing and continue even after a bad year.  Both Curtis Hopkins and another Helena Chemical employee, Barry Norton, went through a typical and, under the circumstances, appropriate credit analysis based on the information provided.

In addition to its credit analysis, Helena Chemical attached two conditions: first, that Richmond Company obtain an operating, or crop, loan, and, second, that the 2005 Helena Chemical debt be paid in full.  Richmond Company appeared to fulfill both conditions.  It obtained a crop production loan from Delta Bank, as discussed below, and paid its 2005 Helena Chemical indebtedness.

Helena Chemical considered the operating/crop loan as an essential and complementary predicate to extending credit.  Curtis Hopkins testified that the aggregate of both the Helena

16

Chemical credit and the operating loan was the approximate amount that his analysis reflected that the Richmond entities needed to effectively farm in 2006.  While Curtis Hopkins never made it an express condition that the 2006 operating loan would not be used to pay 2005 debt, he understood that the full aggregate was necessary to farm in 2006.  He would have reconsidered or perhaps declined[12] the credit if he had known that the Richmond related entities would use the 2006 operating loan to pay old debt.  Additionally, Vic Richmond assured Curtis Hopkins that he had other income sources available to pay his 2005 Helena Chemical debt.

### F.  Delta Bank, a/k/a First National Bank of Phillips County, 2006 Credit

Both JSR and Richmond Company obtained their 2005 and 2006 crop, or operating, loans from Delta Bank.  Again, based on the cyclical nature of farming, the Richmond entities were, in spring 2006, completing their 2006 loan application process while concurrently wrapping up their 2005 obligations.  Other than a brief discussion outlined below, there is no evidence that Helena Chemical was aware of the financial particulars of the Delta Bank credit.  Like Helena Chemical, Delta Bank dealt almost exclusively with Vic Richmond rather than the debtor.

Delta Bank required, as a condition to extending credit in 2006, that Richmond Company and JSR have a 2006 credit line with Helena Chemical and that both had paid their 2005 debt to the bank.  Vic Richmond understood from Delta Bank that the 2006 crop loan proceeds were not to be used to pay off the 2005 debt to Delta Bank.  Delta Bank thought its 2005 loan would be satisfied from unsold 2005 crops.

---

[12] Curtis Hopkins testified that using the 2006 operating loan to pay old debt would have been a consideration but not necessarily a deal breaker had he been informed of Richmond Company's intentions.

Like Helena Chemical, Delta Bank's appreciation of Richmond Company's financial circumstances was that it absolutely needed both a crop loan and the Helena Chemical credit to conduct farming operations in 2006. A bank representative confirmed with a Helena Chemical representative that Helena Chemical would be extending credit in 2006. Both parties to the conversation recognized that their independent credit decisions in large part were based on the mutually complementary and necessary credit decision of the other. Neither would have extended credit without confirmation of the other's participation.

Richmond Company supplied Delta Bank a March 20, 2006 balance sheet (Ex. 30) almost identical to the March 20, 2006 RC 2006 Balance Sheet. (Ex. 28.) Although Helena Chemical was not privy to this document at the time, the balance sheet supplied to Delta Bank, dated the same day as the one supplied to Helena Chemical, reflects an increased farm equity of $103,175. *Compare* $472,825 as listed on Exhibit 30 *with* $369,650 as listed on Exhibit 28.

Richmond Company alone requested $2,050,000 for its 2006 crop production loan. (Ex. 192 at 5037.) On its 2006 Crop Loan Application, Richmond Company estimated crop production costs of $2,032,911, projected annual income of $3,352,392, and cash available for "[r]isk and [u]ncertainity" of $421,381. (Ex.192 at 5037.) *See also* Ex. 194 at 5049 concerning information supplied for JSR's $2,100,000 credit request. Delta Bank extended the requested 2006 credit to both Richmond Company and JSR.

## G. The Kite

As stated above, a condition to the 2006 Helena Chemical credit was that Richmond Company pay its balance still remaining on the 2005 Helena Chemical credit. On a check drawn on Delta Bank, which cleared on April 11, 2006, Richmond Company paid its 2005 Helena

18

Chemical debt of $517,005.25. (Exs. 104 at 968, 190 at 4803.)  Also, on a check against Delta

Bank, JSR likewise paid its 2005 Helena Chemical debt in the amount of $770,004.11; the check

cleared on April 19, 2006. (Exs.111 at 1581, 190 at 4807.)  At or about the same time, both

entities also paid their outstanding 2005 crop loan debt to Delta Bank.[13]

JSR and Richmond Company paid their 2005 debt through an elaborate check kite

utilizing, contrary to their creditors' expectations, their 2006 crop loan from Delta Bank.  The net

effect was to significantly denude both entities of the complementary credit necessary for

farming in the 2006 crop year, thus maximizing the probability that neither entity could

adequately address its 2006 debt to Helena Chemical.[14]

Vic Richmond orchestrated the check kite through a series of transactions between March

30, 2006, and May 4, 2006, using one JSR account, one Richmond Gin account, and two

Richmond Company accounts. (Ex. 190.)  According to the forensic accountant's analysis

discussed below, Richmond Company was clearly insolvent on March 20, 2006, shortly before

the kite began. (Ex. 186 at 4701.)  By April 20, 2006, Delta Bank had advanced $2,025,000 for

the JSR and Richmond Company 2006 crop loans and already $1,816,017.77 had been depleted

to pay 2005 debt. (Ex. 190.)

The debtor participated in the kite.  Historically, the debtor seldom signed checks.  When

he did sign a check or was involved in one being signed for him, he communicated with Knight,

---

[13] Richmond Company paid its 2005 crop loan to Delta Bank with a check dated March 31, 2006, in the amount of $529,008.41 (Ex. 190 at 4798), as did JSR on April 28, 2006, in the amount of $811,284.40. (Ex. 190 at 4809.)

[14] The Richmond entities defaulted on their 2006 debt to both Helena Chemical and Delta Bank.

the bookkeeper, usually by note or voice mail.  She would often sign checks in the debtor's

name.  The debtor testified that he did not keep up with account balances and wrote checks as

instructed.  As for many of the checks directly involved in the kite, the debtor was uncertain of

his signature, but he was confident that Vic Richmond had the authority to sign his name.  The

debtor, however, vaguely recalled uttering a check to pay off a debt to Helena Chemical.

 The check the debtor personally signed was a $725,000 Richmond Company check on

April 18, 2006,[15] drawn on First National Bank of Phillips County, which cleared the next day

and was integral to the kite. (Ex. 190 at 4806.)  The check was payable to JSR, the proceeds of

which JSR used to pay off its 2005 debt to Helena Chemical.  The debtor's memory was vague

as to the circumstances surrounding this check.  He recalls that he was told to sign it, made no

inquiry, was not aware if the transaction was a short-term loan, and did not verify the balance in

the account.  The debtor, however, did know that a check this large would not have been covered

until and unless Richmond Company obtained its 2006 crop loan.

Vic Richmond cloaked the kite with dissimilation and misrepresentation, abetted by

Delta Bank's trust and confidence in him.  The inordinate checking activity raised some

suspicions at Delta Bank, which were addressed in a meeting between Vic Richmond and Delta

Bank representatives.  Vic Richmond assured Delta Bank that Richmond Gin had advanced a

short-term loan against unsold crops to allow JSR to pay off its crop loan; there is no evidence

any such loan existed, and the sole source of sufficient funds was the 2006 crop loans.  Likewise,

Curtis Hopkins with Helena Chemical asked Vic Richmond for a payment date and source of

---

[15] The check is actually dated May 18, 2006, but this may have simply been a mistake as the check cleared on April 19, 2006.

funds; they discussed unsold crops.  From prior dealings, Curtis Hopkins understood that the source was from unsold crops, or, more directly, that Vic Richmond had other sources to pay off the 2005 Helena Chemical debt.  Once paid, Helena Chemical, in late April, 2006, opened up dual $450,000 credit lines for JSR and Richmond Company. (Debtor Ex. 27.)

Almost a year later, in an email to Curtis Hopkins on March 19, 2007, Vic Richmond informed Helena Chemical that Richmond Company, the debtor, and JSR were no longer in a position to make payments on their outstanding indebtedness and that all further communication should be with counsel. (Debtor Ex. 27.)  Helena Chemical had no prior communications with Vic Richmond or the debtor indicating potential or significant problems with their 2006 crops or commensurate payment.  In his email, Vic Richmond indicated that the debtors would work hard to collect the remainder of the 2006 crop revenues and pass any receipts on to their creditors. (Debtor Ex. 27.)  Richmond Company owes Helena Chemical $732,236.36 in principal and interest as of October 28, 2009; the debtor guaranteed this debt and is obligated accordingly.

*H.  Custom Harvesting*

To supplement income, Richmond Company also engaged in custom harvesting, a practice whereby the partnership would harvest crops or otherwise perform farming activities for unrelated third parties.  Rather than protect this valuable business for the benefit of the partnership, particularly when its finances became precarious, Richmond Company allowed this lucrative business to go to other Richmond entities. *See* Exs. 31, 154 at 3293, 155 at 3299, 157 at 3382-88, 158, 160, 161 at 3527, and 193 reflecting a substantial reduction in income to Richmond Company and commensurate increase to Richmond Gin. *See also*, Ex. 101 at 647, a Richmond Company check for $265,547.94 to Richmond Gin for "custom hire."

21

The Richmond related entities also directed valuable module hauling, similar to custom harvesting, to Richmond Gin, an entity not indebted to Helena Chemical.  Larry McClendon, through McClendon, Mann & Felton Gin, Co., Inc. ("McClendon Gin") operated several cotton gins, including locations in Marianna, Hughes, Altheimer, and Sweeden, Arkansas.[16]  Prior to 2006, the relationship between the Richmond related entities and McClendon Gin was the latter ginning cotton for the former.[17]

Larry McClendon sensed that the Sweeden location lacked long-term potential and, accordingly, asked Vic Richmond if he wanted to take over that operation.  Vic Richmond did so through Richmond Gin and, beginning in 2005, started ginning JSR and Richmond Company cotton.

Thereafter, McClendon Gin contracted out module hauling to Richmond related entities. An analysis shows the following payments:

-2002 Vic Richmond Farm for $13,752

-2003 JSR Farms for $85,175

-2004 Jill Janette Richmond, d/b/a JSR Farms for $269,136

-2005 Jill Janette Richmond, d/b/a JSR Farms for $234,858

-2006 Jill Janette Richmond, d/b/a JSR Farms for $8840

-2006 Richmond Gin for $843,390

-2007 Richmond Gin $543,072.24.

---

[16] McClendon Gin previously operated in Altheimer and Sweeden and currently operates in Marianna and Hughes.

[17] Some testimony indicated that Richmond Gin possibly started ginning cotton as early as 2005.

22

(Ex. 91.)  Larry McClendon testified that he had no preference for Richmond Gin and would have contracted with any other Richmond related entity for module hauling.  Vic Richmond selected the beneficiary of the lucrative module hauling business.

By spring 2007, Richmond Company had completely stopped its custom harvesting in favor of Richmond Gin, an entity that, according to its bookkeeper, was essentially broke at the end of 2006.  To even start the module hauling for McClendon Gin, Richmond Gin had to borrow $200,000 from McClendon Gin to buy module trucks. (Ex. 89 at 585.)

The custom harvesting operation also illuminates a pattern and practice, discussed in greater detail below, of Richmond Company– this time in conjunction with Richmond Gin– booking transactions in a false manner designed to maximize tax benefits.  For example, the Richmond Company books show a transfer on May 3, 2006, of $265,547.94 to Richmond Gin for "Contracted Services– Custom Hire." (Ex. 101 at 647.)  Instead of treating this amount as income, Richmond Gin, on its books, reflected the $265,547.94 transaction as a "Loan." (Ex. 186 at 4728.)[18]

### I.  Debtor's Involvement

#### (i)  General

The debtor is a retired postmaster, having left the service in approximately 1990.  Throughout his life, either principally or as a sideline, he has had some involvement in farming; he did this individually or through ownership in various corporate entities.  The debtor testified, incorrectly, that he currently performs unpaid services for his two sons, Vic Richmond and

---

[18] The forensic accountant, discussed below, also questions if this was a real money transfer or simply part of another kiting scheme by the Richmond related entities.

23

Vince Richmond.

Although designated as the manager of Richmond Company, the debtor did not perform the management functions outlined in the Partnership Agreement.  He performed menial tasks; he and others characterized him as a "gopher" for the partnership.  By his own testimony, the debtor never intended to manage Richmond Company.  Vic Richmond asked him to be president, and he agreed because he was aware of Vic Richmond's financial difficulties.  The debtor agreed to sign the Partnership Agreement to keep Vic Richmond and the family operational.  The debtor did not even bother to read the Partnership Agreement, and he personally felt incompetent to handle the financial affairs that he fully delegated to Vic Richmond.

Rather than give his supposed agent, Vic Richmond, directions, he took directions from Vic Richmond relative to Richmond Company.  The debtor admitted that Vic Richmond kept him informed of his handling of the partnership's debt.  The debtor took few opportunities to read documents.  The debtor did not monitor checking account balances and wrote checks at Vic Richmond's direction.

### (ii)  Accounting

Helena Chemical retained the services of a forensic accountant, Stephen Orr ("Orr"), to review the books and records of the various Richmond related entities.  Orr's conclusions are either uncontradicted or insufficiently rebutted, and his report provides in pertinent part:

I.  Summary analysis and opinions.

A.  Vic Richmond, Jill Richmond and Robert Richmond (the "Richmonds") undertook a scheme to maintain their standard of living and postpone business closure by submitting false financial statements, tax returns, bankruptcy filings

24

and books and records, and other financial information, and by failing to keep and maintain usual, customary and reasonable business records for a business enterprise of this type. Specifically, without limiting the generality of the foregoing:

1.  The financial statements submitted to lending institutions and creditors were seriously overstated.

2.  The Richmonds employed a check-kiting scheme at the time they were applying for credit in 2006 to give the appearance that they had the financial capability to pay off 2005 debt, when they were, in fact, insolvent.

3.  There was no entity integrity maintained between Richmond & Company, JSR & Company, Richmond Gin, LLC, Jill Richmond d/b/a JSR Farms, JSR, LLC, Vic Richmond, Jill Richmond and Robert Richmond.

4.  The books and records compiled by the Richmonds contain numerous mischaracterizations of expenditures.  In addition, related party transactions were used to present false and misleading information of the economic activity of the entities.

5.  The transactions between related parties are without adequate supporting documentation.

6.  The tax returns contain false information, and mischaracterize expenses and use related party transactions to hide the true economic impact of business activity.

7.  The books and records were compiled by the Richmonds, but the

25

compilations have been withheld from creditors' review.  Due to the lack of

documentation, the mischaracterization of expenses, the falsification of

financial documents and other similar actions by the Richmonds, it is

difficult or impossible to fully understand the extent of the fraud committed

by the Richmonds, in monetary terms, or the true economic condition of

the entities or the individuals from 2006 to the present.

All of the above actions were done over an extended period of time and, in my

opinion, cannot be attributed to lack of knowledge or error, but instead were

done for the purposes of borrowing more and more money, paying little or no

taxes, and maintaining a high standard of living.

B.  The fraud continued beyond the filing of bankruptcy.

1.  The bankruptcy petition and schedules contain false information

concerning the assets of the individual debtors, their income and their

expenses.

2.  The Richmonds continued the scheme of utilizing shell entities and

mischaracterizing expenses in 2007 and 2008, resulting in false statements

on their bankruptcy petition and on their tax returns. (Ex. 186 at 4493-94.)

### (iii)  Bookkeeping

Knight, a bookkeeper with minimal training, maintained the books for all of the

companies, including Richmond Company.  In addition to participating in the kite,[19] Knight kept

---

[19] Exhibit 195 at 5088 evidences a check written on April 28, 2006 from Richmond Gin
to JSR on the First Bank of Altheimer account for $508,521.58.  Another check was written on
the same day from Richmond Gin to JSR for $272,849.22 on the First National Bank of

26

the books in a haphazard fashion; she ignored the benefits of a general ledger, blurred the distinctions between the various entities, and evinced a willingness to record transactions without sufficient, or any, underlying documentation and in such a manner as to maximize tax benefits at the expense of accuracy. This included occasionally booking inter-company transactions in a contradictory fashion that maximized the tax benefits to each. *See, e.g.,* Ex. 190 at 4803, 4807; Ex. 101 at 647;[20] Ex. 191 at 4935;[21] Ex. 102 at 727; and Ex. 116 at 1925- inter-company transfer listed as an expense on one set of books, but the corresponding entry reflects it as a loan. *See also* Ex. 186 at 4728.

The debtor failed to adequately control, supervise, or admonish Knight and wholly failed to take any corrective action. The debtor allowed Knight to occasionally sign the debtor's name with his approval. Knight characterized the debtor's managerial position as "just a title," and she took most of her direction from Vic Richmond, including participation in the kite. Knight

---

Altheimer account. Both checks contained the signature of Knight. Knight did not know the source of the funds, though the funds were denoted as short-term loans to JSR. On the same day as the deposits were entered, JSR wrote a check to Delta Bank for $811,284.40 to pay off JSR's outstanding 2005 loan.

Exhibit 195 at 5094 is a check dated May 2, 2006 for $262,547.94 signed by Knight on behalf of Richmond Gin to Helena National Bank. At the time that the check was written, the Richmond Gin account had a balance of $1580. The next day, a check signed by Knight from Richmond and Company (Ex. 195 at 5098) for $265,547.94 was deposited in Richmond Gin's account.

[20] Exhibit 101 at 647 shows a check from Richmond Company to Richmond Gin coded as "contracted services/contract hire," whereas Richmond Gin coded the deposit as payment for "loan."

[21] Exhibit 191 at 4935 reflects a check written on July 27, 2006 on the Richmond Company account at Delta Bank to JSR Farms for $1500. The re clause denotes "equipment lease." The corresponding deposit slip for JSR at Delta Bank (Ex. 109 at 1481) was dated July 26, 2006 but deposited on July 28, 2006. Knight testified that she was unaware of any equipment lease.

routinely recorded false entries, including assigning charges against an American Express account to fuel or equipment leases regardless of the actual purchase, to maximize the tax deduction.

The debtor was at least peripherally aware of, and occasionally directly involved in, mischaracterizations for tax purposes. The debtor completed and signed one Richmond Company check to himself in the amount of $1200 to pay interest on a loan; the debit reference on the face of the check is "Partial Land Rent." (Ex. 191 at 4868.) *See also* Ex. 191 at 4869, Richmond Company check to the debtor, signed by the debtor, for real property taxes, denoted as "Partial Land Rent 2006"; also, miscellaneous checks that lack documentation, as in Ex. 191 at 4872, $600 for "March mileage," which, to paraphrase the debtor, was just as the debtor needed something; Ex. 191 at 4912-13, checks of $28,000 and $20,000 to JSR for "Chemical" without sufficient documentation or knowledge on the debtor's part of the chemical transaction suggested; and Ex. 191 at 4927, check for $8000 to JSR for "custom harvesting" without sufficient documentation.

The debtor had his gas paid for through an account at a local gas station, but he also received routine and uniform "mileage" checks. (Ex. 191 on 4872, 4875; Ex. 198 at 5172.) *See also* Ex. 186 at 4516-17, mileage checks in 2006 in $600 increments. Routinely, the debtor did not ask for documentation or the purpose of the checks or documents that he was signing; he simply signed what was put before him.

Jill Richmond, Vic Richmond's wife, held no office or position with Richmond Company but constantly utilized a Richmond Company American Express Gold Card. (Ex. 183.) Account charges were not allocated to the various entities or individuals using the account. The debtor

28

also used the account, and permitted others to do so, without any internal documentation, controls, allocations, reimbursements, or oversight.  In 2006 alone, the year when the house of cards began to fall, there were charges of $942,797.71 against this account. (Ex. 186 at 4731.) The records indicate that Richmond Company routinely expensed payments on the card as either fuel or equipment lease costs, despite the actual itemization reflecting substantial and continuous personal or discrete business uses not in the nature of fuel or equipment lease payments. *E.g.*, Ex. 186 at 4731.  None of the personal charges have a corresponding 1099 or W2.  In other words, individuals routinely lived personally out of the company, with their benefits disguised as expenses to Richmond Company and no income to them. *See* Ex. 186O at 4735, an attempted reconciliation by an accountant that demonstrates the routine understating of income; Exs. 157 at 3382 and 192 at 5040, which reflect conflicting net loss versus income amounts for the same year, 2005.[22]

Richmond Company funds were also used to pay credit cards other than the American Express card.  Many of the charges against these other accounts were personal in nature for Jill or Vic Richmond.  Again, Knight would frequently allocate the credit card payments in a manner designed to maximize the tax benefit, such as for "machinery repair." *See* Ex. 180 at 4116, which is a statement from Capitol One addressed to Vic and Jill Richmond; Ex. 101.[23]

Richmond Company kept rudimentary, at best, books.  Frequently, inter-company entries

---

[22] Exhibit 157 reflects a net loss of $631,080 whereas Exhibit 192 reflects a net gain of $18,920.  Both exhibits are Schedule F, Profit or Loss from Farming for Richmond Company's 2005 tax year form 1040.  Exhibit 157 was filed with the IRS while Exhibit 192 was given to Delta Bank as part of the loan application process.

[23] Several transactions involving Capitol One are coded as machinery repair, supplies and small tools, gas/diesel, and oil.

are unsupported by sufficient documentation or explanation. *See, e.g.,* Exs. 101, 103, 107 at

1143.  Richmond Company funds and expenses were inextricably comingled with other

Richmond related entities.  There is insufficient documentation for most transactions, coupled

with a bookkeeping system designed principally to (1) mischaracterize transactions in an effort

to minimize taxable income and maximize expense deductions, (2) disguise the precarious nature

of Richmond Company's finances, and (3) maintain an artificially high standard of living for the

Richmonds.

### (iv)  Debtor's Employment

In 2006, Richmond Company paid the debtor a $220 per week salary, or $197 net, plus

booked disbursements of $56,885.95.  Many entries appear to be miscellaneous reimbursements,

including $600 increments for mileage plus two large amounts, $24,000 and $21,824.58 for

"Cash Rent- Cash Land Rent." (Ex. 186 at 4515-16.)  JSR similarly reimbursed the debtor in

2006 in the amount of $9,206.49, as did Richmond Gin for $2111.50. (Ex. 186 at 4601, 4654.)

The debtor now works for Farm Manager, LLC, an entity partially owned by Vic and Jill

Richmond, for approximately $100 a week, mainly to pick up the mail.[24]  Farm Manager, LLC

employs Vic Richmond.  DV Farm Group, a farming entity controlled by Vince Richmond,

Vic's brother and the debtor's other son, began farming the four Richmond Company farms in

Jefferson County in 2007 and, in 2008, some of the JSR farmland in Phillips County.  To manage

these properties, DV Farm Group hired Farm Manager, LLC.  Vic Richmond is, accordingly, the

manager of the old JSR and Richmond Company farms.  Vic Richmond, Vince Richmond, and

---

[24] Farm Manager, LLC is comprised of the following members: Jill Richmond, Vic
Richmond, Case Richmond (Vic Richmond's son), and Laura Jill Richmond (Vic Richmond's
daughter).

the debtor have signatory authority on various banking accounts used by the related entities.  DV Farm Group uses the equipment (discussed below) that the debtor, just prior to his bankruptcy, transferred to 2Winfarms, LLC, an entity owned by Vince Richmond and Laura Jill Richmond,[25] who contributed no capital for her 50% ownership.  2Winfarms, LLC was formed to lease equipment to all the Richmond entities.  Richmond Gin also uses 2Winfarms, LLC equipment in performing custom hauling.

### (v)  Debtor's Schedules

The debtor filed his chapter 7 bankruptcy proceeding on September 13, 2007.  As discussed above, it is not possible to reconcile the debtor's schedules, specifically Schedule B- Personal Property or Schedule A- Real Property, with his 2006 Balance Sheet.  Substantial equity is unaccounted for.  The schedules simply fail to account for the disposition of assets, by absolute transfer or security, in the two years prior to bankruptcy, the operative time period that encompasses the effective date of the 2006 Balance Sheet.  Additionally:

-The schedules reference a debt to Rabo AgriFinance with a lien on two tracts of land, but fail to disclose when the transfer for purposes of security may have occurred in the two year period prior to bankruptcy. (Ex. 197 at 5110, 5119, 5154, Question 10.)  This lien is not reflected on the 2006 Balance Sheet.

-In his Schedule D, the debtor references Rabo AgriFinance and the two tracts, values the collateral at $0.00, with debt of $266,655.53 and $153,260.67, but then he states there is no unsecured portion.

-In his Schedule D, the debtor references Scott Financial Services & Leasing as a secured

_____

[25] Laura Jill Richmond may have withdrawn from the entity at the end of 2007.

creditor but fails to list the collateral, values it at zero, states the amount of the claim is "unknown," but states that he intends to surrender the collateral to that creditor. (Ex. 197 at 5119 and 5163.)

-On his 2006 Balance Sheet, the debtor lists total current farm liabilities of $115,500 and total intermediate farm liabilities of $20,850, plus total long-term farm liabilities of $442,000. Presumably, the second two figures were and are fully collateralized. The first figure, $115,500, grew to a total unsecured debt of $1,115,488.02 in the eighteen months prior to the debtor filing his chapter 7 petition.

-In his schedules, the debtor reports that on August 1, 2007, he paid $21,324.58 to Rabo AgriFinance, an entity he now claims is collateralized by the approximately 600 acre tract that he transferred to 2Winfarms, LLC on June 25, 2007. There is no explanation as to why the debtor is paying a debt on property then and now owned by this Richmond family owned LLC. (Ex. 197 at 5151, Question 3.)

-In his Statement of Financial Affairs, the debtor fails to disclose that he published any financial statements within the two year period immediately preceding the commencement of the case. The 2006 Balance Sheet falls within this time period. (Ex. 197 at 5157.)

### (vi)  Conclusion-  Debtor's Involvement

Illusory resources on the Richmond Company financial statement, the kite, the diversion of lucrative custom harvesting and module hauling, the undercapitalization resulting from mis-application of the 2006 crop loan proceeds, the use of Richmond Company funds for personal use, and the fraudulent bookkeeping practices outlined above collectively– and in some instances

32

individually– rendered Richmond Company without sufficient operating funds to effectively farm in 2006, thus resulting in a significant loss to Helena Chemical.  The debtor participated in these activities, either directly or permissively.  Additionally, the debtor transferred land and equipment just prior to his bankruptcy to a Richmond controlled LLC.  This final act is consistent with the Richmond family continuum of self-dealing to the detriment of others.

## IV.  Discussion

Helena Chemical advances several bases for objecting to the debtor's entire discharge or denying dischargeability of specific debt.  In considering each, the court must first determine if the debtor is responsible and accountable solely for his own acts or omissions, or if those of his agent, Vic Richmond, may appropriately be imputed to him.

### A.  Agency Relationship

A principal-agent relationship existed between the debtor and Vic Richmond concerning Richmond Company.  "A principal-agent relationship results from a manifestation of consent by the principal to the agent that the agent should act on his behalf." *Capital City Bank & Trust v. Kroh* (*In re Kroh*), 88 B.R. 987, 992-93 (Bankr. W.D. Mo. 1988) (citing *S. Pac. Transp. v. Cont'l Shippers Assoc.*, 642 F.2d 236, 238 n.1 (8th Cir. 1981)).  "[W]hen there is independent evidence that an agency relationship exists, the fact of a close familial relationship is entitled to considerable weight in tending to show an agency relationship." *Id*. at 993 (citing *Dinger v. Burnham*, 228 S.W.2d 696, 698 n.1 (Mo. 1950)).

Although, at trial, the debtor sought to disassociate himself from and minimize his involvement with Richmond Company, the facts are otherwise.  The debtor was president and part owner of one of the original corporate partners (he owned a half interest in the other two)

and signed the Partnership Agreement in that capacity.  In the Partnership Agreement, the debtor

contractually undertook specifically enumerated financial and farming obligations and

responsibilities with respect to Richmond Company.  Additionally, as the "manager," the debtor

had the normal duties and functions reasonably implicit in that general designation.

Equally conclusive is that the debtor delegated most of his management functions to his

son, Vic Richmond, who acted as his agent in operating Richmond Company.  The debtor

admitted, and Vic Richmond confirmed, this delegation and their principal-agent relationship.

Additionally, the debtor also permitted Vic Richmond to occasionally act as his agent with

respect to the debtor's personal finances, most notably in the preparation and publication of the

debtor's personal financial statements.

The court's findings of fact adequately demonstrate that Vic Richmond did not

responsibly perform as the debtor's agent in the operation of Richmond Company.  An

abbreviated recitation includes ignoring partnership and inter-company formalities and

distinctions, misleading and fraudulent financial statements, seizure and misdirection of business

opportunities, commingling of assets and liabilities, an elaborate and fraudulent check kiting

scheme, misrepresentations concerning the sources and uses of funds (particularly with respect

to payment of the 2005 debt), extensive personal use of business assets, and a bookkeeping

system totally divorced from reality and solely dictated by tax avoidance at the expense of

accuracy.  In short, Vic Richmond and the Richmond family plundered for personal gain the

related companies and the credit obtained by each.  Despite the debtor's delegation of his

responsibilities to Vic Richmond, and his efforts at trial to disassociate himself from the

operations of Richmond Company, the debtor actively participated in and enjoyed the benefits of

many of these practices.

The Eighth Circuit has established that a principal can be liable for the fraud of his agent if certain circumstances are met.  "[M]ore than the mere existence of an agent-principal relationship is required to charge the agent's fraud to the principal." *Treadwell v. Glenstone Lodge, Inc.* (*In re Treadwell*), 423 B.R. 309, 318 (B.A.P. 8th Cir. 2010) (citing *Walker v. Citizens State Bank of Maryville, Mo.* (*Walker I*), 726 F.2d 452, 454 (8th Cir. 1984)).  Actual participation in the fraud by the principal is not always required.  "If the principal either knew or should have known of the agent's fraud, then fraud will be imputed to the debtor-principal." *Id.* The Eighth Circuit in *Walker I* and more recently the Bankruptcy Appellate Panel for the Eighth Circuit in *Treadwell* analyzed the imputed liability issue as follows:

> Proof that a debtor's agent obtains money by fraud does not justify the denial of a discharge to the debtor, unless it is accompanied by proof which demonstrates or justifies an inference that the debtor knew or should have known of the fraud.  If the debtor was recklessly indifferent to the acts of his agent, then the fraud may also be attributable to the debtor-principal.  [...]  The debtor who abstains from all responsibility for his affairs cannot be held innocent for the fraud of his agent if, had he paid minimal attention, he would have been alerted to the fraud.

*Id.* (internal citations omitted).

A court in the Eastern District of Arkansas has applied the precedent established by the Eighth Circuit in *Walker I* to determine whether an agent's fraud can be imputed to a debtor-principal. *Helena Chem. Co. v. Simmons* (*In re Simmons*), 364 B.R. 673, 677 (Bankr. E.D. Ark. 2007) (holding that once debtor knew of his agent-son's fraud, the debtor became a participant in the fraud and could not be granted a discharge).  In that case, the court recognized the "widely-accepted principle that an agent's fraud may be imputed to the agent's principal, such that the principal may be denied a discharge pursuant to § 523." *Id.*; *see Gregory Co, Inc. v. Herrin* (*In*

35

*re Herrin*), No. 1:01-AP-1009, 2002 WL 32114565, at *2 (Bankr. E.D. Ark. Dec. 10, 2002).

*Simmons* is a case where the principal-father's signature was forged by his agent-son on a

personal guarantee to secure debt to Helena Chemical Company. *Id.* at 676.  The father "knew or

should have known of the fraud committed" by his son, but the father "failed to notify or

otherwise alert HCC to the fraud." *Id.*

 *W-V Enterprises, Inc. v. Guse* is similar to the instant case because the debtor-principal

did almost nothing to monitor his agent and gave him "[an] almost absolute grant of power to

make business judgments."  *W-V Enter., Inc. v. Guse* (*In re Guse*), 150 B.R. 950, 953 (Bankr.

E.D. Mo. 1993).  "The debtor blindly signed whatever documents were brought before him by

his agent." *Id.*  The *Guse* court held, "for purposes of a determination of dischargeability under

Section 523(a)(2)(A), the fraud of an agent acting within the scope of his or her employment or

apparent authority is imputed to the debtor/principal." *Id.* at 954 (citing *In re Walker* (*Walker II*),

53 B.R. 174, 182 (Bankr. W.D. Mo. 1985)).[26]  In addition, the "[d]ebtor's failure to inquire into

[the agent's] background at any time, his willingness to sign any document placed before him by

[his agent], and his complete lack of limitation on [his agent's] authority to act on his behalf

support the conclusion that [d]ebtor knew or should have know of his agent's fraud." *Id.* (citing

*Walker I,* 726 F.2d at 452).

 Unless specially delineated otherwise below, the court concludes that the fraudulent

activities of Vic Richmond with respect to Richmond Company may appropriately be imputed to

the debtor.  The debtor either knew, or should have known, of Vic Richmond's fraud.  At best,

---

 [26] *Walker II* is the remanded case subsequent to *Walker I* holding false financial statements made by an agent while acting within the scope of her authority will be imputed to the debtor-principal.

the debtor was recklessly indifferent to how his agent was conducting his– the principal's– business.  A number of factors compel this conclusion.

The debtor assumed the management responsibilities of Richmond Company with full knowledge and in part because Vic Richmond was personally insolvent, unable to obtain credit, had just managed Richmond Farming into decline, and had ongoing problems with the IRS.  The debtor delegated to his agent responsibilities that the debtor knew his agent otherwise could not undertake directly and had done so unsuccessfully in the past.  The debtor never insisted on documenting the agency relationship, a telling omission given the agent's significant financial problems about which the debtor was acutely familiar.  The debtor recklessly signed whatever was placed before him without proofreading or checking the values on the various financial statements provided to Helena Chemical.  During this entire time, the debtor gave Vic Richmond *carte blanc*, never monitoring, overseeing, or checking his work while enjoying the considerable benefits of his and his agent's fraud.  In addition to delegating his management role to Vic Richmond, the debtor knowingly abdicated or irresponsibly performed all oversight functions and responsibilities, including in any way requiring the partnership to conduct business in conformity with generally accepted partnership and accounting principles.

The debtor also actively participated in fraudulent conduct, which not only has independent consequences relative to his discharge but also enhances the unfavorable nexus between he and his agent, Vic Richmond.  Again, the debtor's attempt to dissociate himself from Richmond Company fails in light of his ownership in the corporate partners, his role as manager as set forth in the Partnership Agreement, his almost daily contact with the partnership's farming operation, and his occasional forays into fraudulent activity on its behalf and to his financial

37

advantage.

The debtor and Vic Richmond occasionally consulted on partnership matters.  The debtor had considerable contact with the partnership and its business activities.  He cannot claim ignorance of the manner in which the partnership inappropriately conducted its operations and financial affairs.  The debtor basically signed whatever was put before him, either knowingly or recklessly disregarding the consequences, including the anticipated reliance of third-parties.  The debtor allowed the publication of financial statements that he had to have known falsely portrayed a picture of Richmond Company totally at odds with reality– a company gutted by self-dealing transfers obscured by fraudulent bookkeeping practices.

 Helena Chemical, for the most part, treated Vic Richmond as the principal operator of Richmond Company.  This treatment does not, however, relieve the debtor from his obligations as manager, the fraud of his agent, his own fraud, and Helena Chemical's reliance on the debtor's personal representations and information provided.  In obtaining credit from Helena Chemical, the debtor participated in a face-to-face meeting where he gave assurances and comfort to a Helena Chemical representative as to his ability to operate a large farm.  The debtor knows what a guaranty is and in addition to executing one to Helena Chemical's benefit, knowingly allowed inaccurate financial statements to be prepared and published to the creditor. The debtor was fully aware of the need, amount, and timing of the requests for credit from Helena Chemical.

The debtor directly participated in the kite.  He signed a check for $725,000 on April 18, 2006, on an insolvent entity.  He knew it could be covered only if Richmond Company obtained the 2006 crop loan, thus knowingly depriving the company of its necessary 2006 funding for

38

farming purposes.  The debtor's actions and those of his agent, Vic Richmond, individually and in the aggregate, resulted in damage to Helena Chemical.

### B.  11 U.S.C. § 523(a)(2)(A) & (B)

Helena Chemical asserts that the debtor's obligation under his guaranty should be declared nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(A) and (B) because the debtor not only provided Helena Chemical with false and misleading financial statements, upon which Helena Chemical relied in extending credit, but the debtor also induced Helena Chemical to extend credit through false pretenses and false representations. (Compl. at 6-7.)

Sections 523(a)(2)(A) and (B) provide as follows:

> (a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt–
>> (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by –
>>> (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition; [or]
>>> (B) use of a statement in writing–
>>>> (i) that is materially false;
>>>> (ii) respecting the debtor's or an insider's financial condition;
>>>> (iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and
>>>> (iv) that the debtor caused to be made or published with intent to deceive[.]

"Subsections 523(a)(2)(A) and (B) are mutually exclusive" as subsection (B) is clearly applicable only to written statements respecting a debtor's or insider's financial condition while subsection (A) excludes statements respecting a debtor's or insider's financial condition. *Nangle v. Lauer* (*In re Lauer*), 371 F.3d 406, 413 (8th Cir. 2004) (citing *First Nat'l Bank of Olathe v. Pontow*, 111 F.3d 604, 608 (8th Cir. 1997)); *see Barclays Am./Bus. Credit, Inc. v. Long* (*In re Long*), 774 F.2d 875, 877 n.1 (8th Cir. 1985); *Fairfax State Sav. Bank v. McCleary* (*In re*

39

*McCleary*), 284 B.R. 876, 883 (Bankr. N.D. Iowa 2002) (noting that "[c]ase law has consistently and unanimously held that paragraphs (A) and (B) of § 523(a)(2) are mutually exclusive"). Based on the mutual exclusivity of the subsections, some courts have determined that "a debt obtained by a false oral 'statement respecting the debtor's . . . financial condition' is dischargeable." *Cadwell v. Joelson* (*In re Joelson*), 427 F.3d 700, 704 (10th Cir. 2005). *See*, *Prim Capital Corp. v. May* (*In re May*), No. 06-8044, 2007 WL 2052185, at *5 (B.A.P. 6th Cir. July 19, 2007) (stating that "[a]ll statements regarding a debtor's financial condition, whether written or oral, are expressly excluded from subsection (A)"); *Lazaron v. Lucas* (*In re Lucas*), 386 B.R. 332, 336 (Bankr. D. N.M. 2008) (providing that for a statement regarding the debtor's financial condition "to form the basis of a non-dischargeable debt, it must be written").

### i.  11 U.S.C. § 523(a)(2)(A)

Specifically, 11 U.S.C. § 523(a)(2)(A) provides an exception to discharge "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition."  Despite the disjunctive language and the three separate bases for relief set forth in subsection (A), courts often analyze all three bases, particularly false representations and actual fraud, using the same four elements required in an 11 U.S.C. § 523(a)(2)(B) examination: "(1) the debtor made a false representation; (2) at the time the representation was made the debtor knew it was false; (3) the debtor subjectively intended to deceive the creditor at the time he made the representation; and (4) the creditor justifiably relied on the representation." *Treadwell*, 423 B.R. at 314 (quoting *Lee v. Eccles* (*In re Eccles*), 407 B.R. 338, 342 (B.A.P. 8th Cir. 2009)).  "Subsection (A) [however] does not require

40

the creditor to prove the four elements of subsection (B)." *Pontow*, 111 F.3d at 608.  Rather, the

creditor must prove by a preponderance of the evidence that the debtor obtained "money,

property, services, or an extension, renewal, or refinancing of credit" by "false pretenses, a false

representation, or actual fraud" other than a statement respecting the debtor's or an insider's

financial condition, upon which the creditor justifiably relied. *Grogan v. Garner*, 498 U.S. 279,

289 (1991) (standard of review); *Treadwell,* 423 B.R. at 313-14.

In this instance, Helena Chemical has not alleged actual fraud.  Rather, it relies on false

pretenses or false representations.  Only the former is availing.

The Bankruptcy Appellate Panel for the Eighth Circuit has defined false pretenses as an

"implied misrepresentation or conduct intended to create and foster a false impression." *Merch.*

*Nat'l Bank v. Moen* (*In re Moen*), 238 B.R. 785, 791 (B.A.P. 8th Cir. 1999) (quoting *Leeb v. Guy*

(*In re Guy)*, 101 B.R. 961, 978 (Bankr. N.D. Ind. 1988)).  False pretenses also include "a series

of events, activities or communications which, when considered collectively, create a false and

misleading set of circumstances, or false and misleading understanding of a transaction, in which

a creditor is wrongfully induced by the debtor to transfer property or extend credit to the debtor."

*Quality Foods, Inc. v. Donckers* (*In re Donckers*), Ch. 7 Case No. 5:05-bk-75192, Adv. No.

5:05-ap-07158, slip op. at 13 (E.D. Ark. Apr. 26, 2006) (citing *Check Control, Inc. v. Anderson*

(*In re Anderson*), 181 B.R. 943, 950 (Bankr. D. Minn. 1995)).

Courts have examined what constitutes a statement respecting the debtor's or an insider's

financial condition.  In *McCleary*, the court noted that a "statement respecting the debtor's

financial condition is one concerning the debtor's overall financial health, net worth, or ability to

generate income." 284 B.R. at 884 (citing *Kloven v. Ramsey*, No. 4-92-CV-1249, 1993 WL

41

181309, at *2 (D. Minn. Apr. 22, 1993)); *see also Long*, 774 F.3d at 877 (providing that "a [d]ebtor's misrepresentations as to the value of its inventory" is a statement concerning the debtor's financial condition); *R&R Ready Mix, Inc. v. Freier* (*In re Freier*), 402 B.R. 891, 898-99 (analyzing a personal financial statement submitted by the debtor listing the debtor's assets, liabilities, and secured creditors) *rev'd on other grounds*, 604 F.3d 583 (8th Cir. 2010); *First Fed. Bank v. Mulder* (*In re Mulder*), 306 B.R. 265, 271 (Bankr. N.D. Iowa 2004) (recognizing that a financial statement does not have to be a "traditional financial statement" and that "any statement about any of a debtor's assets or liabilities, in the broadest sense, may relate to" a debtor's financial condition); and *Agribank, FCB v. Webb* (*In re Webb*), 256 B.R. 292, 295-96 (Bankr. E.D. Ark. 2000) (stating that a loan application was a statement in writing respecting the debtor's financial condition under section 523(a)(2)).

In *Field v. Mans*, the United States Supreme Court noted that "some degree of reliance is required to satisfy the element of causation inherent" in a section 523(a)(2)(A) claim. 516 U.S. 59, 66 (1995).  The Court concluded its opinion by holding that "§523(a)(2)(A) requires justifiable, but not reasonable, reliance." *Id.* at 74-75.  "Justifiable reliance is a minimal standard and does not require the creditor to conduct an investigation, even if the failure to investigate would be considered negligent and the falsity of the representation would be readily discoverable upon an investigation." *Freier*, 402 B.R. at 898 (quoting *Field v. Mans*, 516 U.S. at 70-71).[27]

---

[27] In *Frier*, the Bankruptcy Appellate Panel for the Eighth Circuit concluded that the creditor was on notice of the debtor's financial position as the debtor disclosed during negotiations that he would be forced to file bankruptcy if the creditor demanded harsh terms for repayment of the existing debt. 402 B.R. at 898.  As such, the creditor's reliance was not justifiable. *Id.*  The Eighth Circuit did not concur with the Bankruptcy Appellate Panel's findings and held that the creditor did rely upon the representations put forth by the debtor regarding his ability to make payments. *Frier*, 604 F.3d 583 (8th Cir. 2010).

However, a creditor cannot "blindly rel[y] upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation." *Id.* (quoting *Field*, 516 U.S. at 71); *Mulder*, 306 B.R. at 272 (noting that unless "warning signs" are present based on the "debtor's conduct or statements, the creditor" does not have an obligation to investigate); *Treadwell*, 423 B.R. at 316 (finding that the creditor justifiably relied on the debtor's representation as "no obvious warning signs of falsity" existed and an investigation would not have unearthed any).

Therefore, to meet its burden of proof under 11 U.S.C. § 523(a)(2)(A), Helena Chemical must prove by a preponderance of the evidence that the debtor obtained money, property, services, or an extension, renewal, or refinancing of credit by false pretenses, upon which the creditor justifiably relied, other than a statement respecting the debtor's or an insider's financial condition.

Helena Chemical has met its burden specifically and solely on the context of the spring 2006 check kiting scheme. The debtor, individually and insofar as the actions of Vic Richmond are imputed to him, used false pretenses to obtain credit guaranteed by the debtor. In making this determination, the court is not ignoring the extensive litany of inappropriate and fraudulent business practices of the debtor and Vic Richmond. Those activities individually and in the aggregate contributed to the publication of false and misleading financial information, the consequences of which are dealt with below. But, a representation of the debtor's or Richmond Company's overall financial condition is a consideration inappropriate in a § 523(a)(2)(A) analysis. The kite, however, is altogether a different proposition.

In March 2006, Richmond Company was insolvent. It owed substantial 2005 debt both

43

to Helena Chemical and its crop loan lender, Delta Bank.  The debtor cannot contend or suggest that he was unaware of Richmond Company's financial condition or that the business needed the mutually complementary lines of credit to successfully farm in 2006.  He had a history of farming and was aware of the farm's operational needs.  Also, both the debtor and his agent, Vic Richmond, had to be aware that using the new credit to pay old debt would denude the farming operation of the money it needed to effectively farm in 2006, thus minimizing the chances, or any reasonable expectation, of paying Helena Chemical's 2006 debt.  Delta Bank made this an express condition.  Vic Richmond affirmatively represented and led Helena Chemical to believe that Richmond Company had other resources to pay off their 2005 debt.  The extinguishment of old debt from already available resources was clearly a part of Helena Chemical's 2006 credit analysis and its calculation of the amount of credit that would be available, and absolutely necessary, to farm in 2006.  The debtor was aware of the financial condition of Richmond Company, and he knew that the $725,000 check that he uttered as part of the kite would not be covered unless the new loans were obtained.

Accordingly, Vic Richmond and the debtor chose to play a shell game with the 2006 crop loan proceeds to avoid the unsatisfactory consequences of their inability to pay their 2005 debt, thus, they obtained the necessary 2006 credit under false pretenses.  When the debtor wrote the $725,000 check, he was not making a statement concerning his or Richmond Company's overall financial condition.  Rather, he was taking an affirmative and specific step, as part of an overall scheme, to disguise how Richmond Company would retire its 2005 debt.

If indeed false pretenses has an existence independent of the other two bases set forth in section 523(a)(2)(A), then Helena Chemical met its burden of proof in that regard.  Specifically,

44

the debtor individually and in conjunction with his agent, Vic Richmond, engaged in a series of implied misrepresentations or conduct intended to create and foster the false impression that Richmond Company had retired its 2005 debt from sources other than the 2006 credit.  They engaged in a series of activities that created a false and misleading set of circumstances or understanding of a transaction.  Helena Chemical, justifiably relying on the impression that Richmond Company had cleared its old debt and would now have the credit resources to effectively farm in 2006, was thereby wrongfully induced to extend credit in 2006.  For false pretenses, the debtor's obligation to Helena Chemical is nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(A).[28]

### (ii)  11 U.S.C. § 523(a)(2)(B)

To establish a claim under 11 U.S.C. § 523(a)(2)(B), Helena Chemical must establish the following elements: (1) the debtor used a statement in writing that was materially false; (2) the statement related to the debtor's or the debtor's business's financial condition; (3) Helena Chemical reasonably relied on the statement; and (4) the debtor made the statement with the intent to deceive Helena Chemical. *Freier*, 402 B.R. at 898 (citing *Jacobus v. Binns* (*In re Binns*), 328 B.R. 126, 129 (B.A.P. 8th Cir. 2005)).  Helena Chemical must prove each of the above elements by a preponderance of the evidence. *Grogan*, 498 U.S. at 287.

The first prong of an 11 U.S.C. § 523(a)(2)(B) analysis concerns whether the debtor

---

[28] As stated above, courts frequently use the four elements of section 523(a)(2)(B) in considering a false representation claim.  It, however, will not be necessary to consider false representation and the attendant four elements under a section 523(a)(2)(A) analysis because, as discussed below, a similar analysis under section 523(a)(2)(B) has the same result.

submitted a written statement that is materially false.[29]  Written statements need not be prepared

nor signed by the debtor himself; rather, the writing requirement is satisfied if the debtor

"adopted and used, or caused [the document] to be prepared." *McCleary*, 284 B.R. at 885; *see*

*Ripley Co. State Bank v. Shelton*, 42 B.R. 547, 548 (Bankr. E.D. Mo. 1984) (stating that nothing

requires a debtor to sign a financial statement, only that "the debtor cause[d] (the financial

statement) to be made or published").

      "[A] statement is materially false if it paints a substantially untruthful picture of a

financial condition by a misrepresentation of the type which would normally affect the decision

to grant credit." *McCleary*, 284 B.R. at 885 (citing *Meyer v. Dygert* (*In re Dygert*), 2000 WL

63088, at *8 (Bankr. D. Minn. May 11, 2000)); *see also Webb*, 256 B.R. at 296; *Avco Fin. Servs.*

*v. Lesher* (*In re Lesher*), 80 B.R. 121, 123-24 (Bankr. E.D. Ark. 1987); *Alden State Bank v.*

*Anderson* (*In re Anderson*), 29 B.R. 184, 191-92 (Bankr. N.D. Iowa 1983) (citation omitted)

(stating that the "omission of a substantial item of liability upon a statement calling for a listing

of all liabilities and requiring the amount of total liabilities and net worth to be expressly set

forth makes the statement a materially false one").  A "substantially untruthful picture of a

financial condition" has been interpreted by several courts. *See Heritage Bank of St. Joseph v.*

*Bohr* (*In re Bohr*), 271 B.R. 162, 167 (Bankr. W.D. Mo. 2001) (finding that the debtors

misrepresented their financial condition by overestimating their net worth and by failing to

inform the creditor that the debtors had merely an expectancy interest in some real estate);

*Lesher*, 80 B.R. at 123 (finding that the debtor's loan application was materially false by

---

      [29] This first element also implicitly incorporates part of 11 U.S.C. § 523(a)(2)(B)(iv), which provides "that the debtor caused [the statement] to be made or published."

omitting 80% of the debtor's liabilities); *Webb*, 256 B.R. at 295 (holding that a debtor's "off the top of his head" calculations that resulted in "grossly misstated" net worth on a loan application with Helena Chemical Company constituted a materially false statement); *McCleary*, 284 B.R. at 886 (concluding that the debtor's silence regarding a $6000 outstanding balance was not a material misrepresentation in light of the debtor's net expenditures).

Helena Chemical has met its burden with respect to the information provided by the debtor for Richmond Company. Here, the focus is on the financial statement, termed a balance sheet, supplied to Helena Chemical attendant to the 2006 credit.

Vic Richmond prepared the RC 2006 Balance Sheet, which reflected total assets of $1,514,825, total farm liabilities of $1,145,175, and $369,650 in farm equity. The debtor knew Richmond Company was seeking credit from Helena Chemical and that financial information was required; he consented to Vic Richmond signing the debtor's name and publishing it to Helena Chemical on or about April 10, 2006.

The RC 2006 Balance Sheet is materially false. Specifically:

-Cash and equivalents of $218,700. Vic Richmond was unable to substantiate this figure either through cash alone or an aggregate of cash plus vague, unspecified, and insufficiently documented accounts receivable, program payments, or rebates. A reconstruction of Richmond Company's records reflects a then cash balance on hand of $40,623.63. (Exs. 102 at 690-91, 104 at 960, 106 at 1024-25, 108 at 1152.)

-FSA 2005 receivables are overstated by $41,228. (Ex. 186H.)

-Inter-company advances of $67,756.33 are ignored. (Ex. 186H.) This would otherwise be an improvement on the asset side. The Richmonds, however, showed no propensity to

47

properly account for and collect inter-company debt.  Thus, this receivable actually represents an adverse financial drain on Richmond Company.  Full disclosure of inter-company loans might have invited additional inquiry.

-05 Crop- Inventory and Receivables of $279,500.  Vic Richmond could not provide specifics that would justify or support this entry, either as a rebate (Richmond Gin had never paid Richmond Company a rebate) or as "ccp" payments, which were already allocated on the asset side.  The Helena Chemical forensic accountant determined that this figure was overstated by $182,941.23. (Ex. 186H.)

-Account and notes receivable of $165,600.  Other than suggesting that he collected "a lot of it," Vic Richmond could not provide specifics or substantive detail that would support or justify this figure.  Helena Chemical's forensic accountant found no record or evidence justifying this figure. (Ex. 186H.)

-Richmond Company reported Other Current Assets (06 Inputs) of $236,400.  The forensic accountant could find no record or evidence justifying this figure. (Ex. 186H.)

-2006 FSA payments of $320,000 were overstated by $133,426. (Ex.186H.)

-Inter-company liabilities of $127,000 are ignored. (Ex. 186H.)

The picture presented is that of a healthy company with present and reasonably anticipated cash resources, important considerations given the need to retire the 2005 debt coupled with its 2006 operational needs.  The RC 2006 Balance Sheet is polar opposite from the reality of how the debtor, the Richmond family, and Richmond Company actually conducted business and Richmond Company's then current financial condition.

The second element that Helena Chemical must prove is that the statement produced by

48

the debtor relates to the debtor's or an insider's financial condition.  Richmond Company and the debtor enjoy insider status.  11 U.S.C. § 101(31)(A) provides as follows:

> (31) The term "insider" includes–
>     (A) if the debtor is an individual–
>         (i) relative of the debtor or of a general partner of the debtor;
>         (ii) partnership in which the debtor is a general partner;
>         (iii) general partner of the debtor; or
>         (iv) corporation of which the debtor is a director, officer, or person in control[.]

Section 101(31) uses the term "includes" when referring to the definition of an insider if the debtor is an individual.  Under the Code, "'includes' and 'including' are not limiting." 11 U.S.C. § 102(3).  Thus, "the list is illustrative, not exclusive." *Stalnaker v. Gratton* (*In re Rosen Auto Leasing, Inc.*), 346 B.R. 798, 804 (B.A.P. 8th Cir. 2006) (citing 11 U.S.C. § 102(3)).  The court is allowed to look beyond the statute to determine if someone is an insider.  "An insider is one who has a sufficiently close relationship with the debtor that his or her conduct should be subject to closer scrutiny than those dealing at arms length with the debtor." *Id. See* H.R. REP. No. 95-595, at 25 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6269. *See also In re Krehl*, 86 F.3d 737, 741 (7th Cir. 1996); *Butler v. David Shaw, Inc.*, 72 F.3d 437, 443 (4th Cir. 1996).

 To be specific, "[a]n insider is one who does not deal at arm's length with the debtor." *Id*. (citing *Carlson v. Farmers Home Admin.* (*In re Newcomb*), 744 F.2d 621, 625 n.4 (8th Cir. 1984)).  "The courts have struggled with what constitutes a 'sufficiently close relationship' requiring such 'closer scrutiny.'" *Rainsdon v. Farson* (*In re Farson*), 387 B.R. 784, 792 (Bankr. D. Idaho 2008).  "The determination is a fact-intensive one, and must be decided on a case-by-case basis." *Id*. (citing *Matson v. Strickland* (*In re Strickland*), 230 B.R. 276, 285 (Bankr. E.D. Va. 1999); *Three Flint Hill Ltd. P'ship v. Prudential Ins. Co.* (*In re Three Flint Hill Ltd. P'ship*), 213 B.R. 292, 298 (D. Md. 1997)).

The court may look beyond section 101(31) in determining who is an insider in this case. The facts set forth above clearly demonstrate that Richmond Company is an insider to the debtor. The debtor is the manager of Richmond Company, the president of one of its founding partners, a part owner of the remaining two initial partners, was employed by Richmond Company, and participated in its proper and improper activities, including the publication of false financial information.

The third prong of a section 523(a)(2)(B) analysis requires Helena Chemical to have reasonably relied on the debtor's materially false statement.  Similar to the justifiable reliance standard required in an 11 U.S.C. § 523(a)(2)(A) analysis, the reasonable reliance standard looks to the totality of the circumstances. *Freier*, 402 B.R. at 898.  This standard does not presume that every debtor is lying or misrepresenting facts contained in a financial statement. *Bohr*, 271 B.R. at 168.

In analyzing this prong, the court engages in a two-part analysis: "whether there were any 'red flags' that would have alerted an ordinary prudent lender to the possibility that the representations relied upon were not accurate; and whether minimal investigation would have revealed the inaccuracy of the debtor's representations." *Pontow*, 111. F.3d at 610 (declaring that the creditor was aware that the debtor's financial statement contained inaccuracies, and, as such, the creditor could not reasonably rely); *Twin City Bank v. Harris* (*In re Harris*), 360 B.R. 267, 272 (Bankr. E.D. Ark. 2007) (finding that the creditor requested too little information to have reasonably relied on the documentation submitted); *McCleary*, 284 B.R. at 887 (concluding that the bank's reliance on documents indicating the debtor's history of profitability, not his significant liabilities, was not only in direct contravention of the bank's normal operating

50

procedures but also unreasonable as the bank did not have sufficient information concerning the debtor's financial condition); *Bohr*, 271 B.R. at 168-69 (noting that the creditor reasonably relied on the falsities contained in the debtors' financial statement even though a minimal investigation would have revealed significant inaccuracies). "Reasonable reliance can [ ] be demonstrated by showing that credit would not have been extended had accurate information been provided." *Rosen's, Inc. v. Ghere* (*In re Ghere*), 393 B.R. 209, 217 (Bankr. W.D. Mo. 2008) (citing *Norbank v. Kroh* (*In re Kroh*), 87 B.R. 1004, 1008 (Bankr. W.D. Mo. 1988)).

Helena Chemical reasonably relied on the RC 2006 Balance Sheet in making its credit decision. The record reflects that the Helena Chemical representatives went through a normal and typical credit analysis. The financial information reflected that the farming entity had ample resources and anticipated income sufficient to carry it through the cyclical risks attendant to farming. Had the financial information alerted Helena Chemical that the borrower did not have receivables and anticipated income sufficient to address its 2005 debt, then the creditor would have engaged in a different analysis with perhaps a different result. The creditor was not afforded that opportunity. There were no red flags sufficient to alert Helena Chemical to the inaccuracies, and the record reflects sufficient investigation.

The final element that Helena Chemical must prove is that the debtor acted with an intent to deceive Helena Chemical. "Direct evidence of intent rarely exists and courts may look to surrounding circumstances to ascertain intent." *Ghere*, 393 B.R. at 215 (citations omitted). The debtor does not have to possess a "malignant heart." *Id.* Rather, a debtor's "reckless indifference to or reckless disregard [for] the accuracy of [ ] information" is sufficient to prove this subjective intent prong. *McCleary*, 284 B.R. at 888 (determining that a debtor did not intend to deceive his

51

creditor by failing to provide more detailed and accurate financial documents, which a cursory inspection by the creditor would have revealed as inaccurate); *Webb*, 256 B.R. at 297 (finding that the debtor clearly intended to deceive his creditor when he submitted a loan application in which the debtor "knowingly inflated his assets and grossly understated his liabilities").  Further, a debtor's "mere unsupported assertions of honest intent will not overcome natural inferences derived from admitted facts." *Ghere*, 393 B.R. at 215 (noting that a debtor's admission that he was not familiar with the software program utilized by his business and his failure to disclose significant indebtedness on his financial statements constituted a reckless disregard for the truth, not an honest mistake).

Helena Chemical met its burden of proof on this fourth element as the debtor published the RC 2006 Balance Sheet with the intent to deceive.  The Richmond Company bookkeeping methodology was systemically fraudulent, one designed to disguise the true nature of transactions with emphases on tax avoidance and sustaining an artificially high standard of living for all the Richmonds, including the debtor.  Although Helena Chemical cannot contend that it was aware of the bookkeeping irregularities or that the Richmonds were personally devouring the partnership's assets, clearly the debtor and Vic Richmond had knowledge of these activities, including the misdirection of corporate opportunities and the irrefutably distressed condition of Richmond Company.  The financial information published to Helena Chemical reflects a concerted effort to conceal the true nature of how the Richmonds ran their business and projects a favorable financial picture inconsistent with reality.  The debtor personally and in conjunction with his agent, knowingly and with the intent to deceive, published a materially false financial statement respecting the financial condition of Richmond Company.

52

For the reasons stated herein, the debtor's debt to Helena Chemical is nondischargeable pursuant to section 523(a)(2)(B).

*C.  11 U.S.C. § 523(a)(6)*

Section 523(a)(6) of the Bankruptcy Code specifically exempts from discharge debt for "willful and malicious injury by the debtor to another entity or to the property of another entity[.]"  The basis for this claim is that the debtor disposed of equipment subject to the Security Agreement without Helena Chemical's consent and did not apply the proceeds to its debt. Helena Chemical has failed to meet its burden of proof on this count.

To establish the nondischargeability of its debt under this section, Helena Chemical must prove, by a preponderance of the evidence, that it suffered a deliberate or intentional injury and that the injury was both "willful and malicious," which are two distinct elements. *Blocker v. Patch* (*In re Patch*), 526 F.3d 1176, 1180 (8th Cir. 2008) (citing *Fischer v. Scarborough* (*In re Scarborough*), 171 F.3d 638, 641 (8th Cir. 1999)).

In *Geiger*, the United States Supreme Court resolved a split among the circuits as to what constitutes an injury within the definition of willful. *Kawaauhau v. Geiger*, 523 U.S. 57, 61 (1998).  "[D]ebts arising from recklessly or negligently inflicted injuries do not fall within the compass of § 523(a)(6)," rather "nondischargeability takes a deliberate or intentional injury, not merely a deliberate or intentional act that leads to injury." *Id.* at 61, 64.  Since *Geiger*, the definition of a willful injury has expanded to include those instances where "the debtor [either] desires to bring about the consequences of his conduct" or when "the debtor knows that the consequences are certain, or substantially certain, to result from his conduct." *Sells v. Porter* (*In re Porter*), 539 F.3d 889, 894 (8th Cir. 2008) (quoting *Patch*, 526 F.3d at 1180).

53

Helena Chemical must also prove that the debtor caused a malicious injury in addition to a wilful injury. The statute is conjunctive. The Eighth Circuit has defined a "malicious" injury as conduct that is "more culpable than that which is in reckless disregard of [the] creditors' economic interests and expectations, as distinguished from mere legal rights." *Vaughn v. Quinn* (*In re Quinn*) 170 B.R. 1013, 1018 (Bankr. E.D. Mo. 1994) (citing *Long*, 774 F.2d at 881). Malice requires conduct that exceeds recklessness and encompasses an act "targeted at the creditor . . . at least in the sense that the conduct is certain or almost certain to cause . . . harm." *Porter*, 539 F.3d at 894 (citing *Siemer v. Nangle* (*In re Nangle*), 274 F.3d 481, 484 (8th Cir. 2001)).

Several courts have analyzed what actions by a debtor constitute "willful" and "malicious" under § 523(a)(6). *Porter*, 539 F.3d at 889 (holding that a debtor's retaliatory actions caused a willful and malicious injury– forcing the plaintiff to choose between giving up a harassment claim or continuing to work in a harassing environment); *Patch,* 526 F.3d at 1182–83 (concurring that a wrongful death judgment was dischargeable even though the debtor refrained from obtaining medical assistance for her son, who later died from injuries suffered at the hand of the debtor's boyfriend, because the debtor's actions were not willful as the mother did not intend the consequence of her child dying); *Mercantile Bank of Ark., N.A., v. Speers* (*In re Speers*), 244 B.R. 142 (Bankr. E.D. Ark. 2000) (finding that a debtor's disposal of property subject to a security interest and retention of the sale proceeds constituted conversion sufficient to find the debt nondischargeable based on the debtor's willful and malicious injury).

Helena Chemical failed to meet its burden of proving that the debtor intended to cause a wilful and malicious injury to Helena Chemical in disposing of the collateral. Specifically, there

54

are three sets of equipment involved in this analysis: first, the specific collateral pledged to Helena Chemical; second, the collateral transferred to 2WinFarms, LLC on the eve of bankruptcy; and third, the equipment listed on the schedules that the debtor states that he will abandon to Helena Chemical. This last set is not specifically listed in the Helena Chemical Security Agreement; it appears that this equipment is actually pledged to Delta Bank, and, at best, Helena Chemical has a second lien based on standard security agreement language. None of the three sets match. In other words, the equipment transferred on the eve of bankruptcy is not the equipment pledged to Helena Chemical.

The debtor transferred equipment to 2Winfarms, LLC just three days before filing his petition. In that instance, the debtor sold and transferred his equipment to an entity made up of family members who, in a new business structure, farm the same acreage as did Richmond Company. The debtor's goal was to place his equipment intentionally beyond the reach of his creditors; the consequences of that effort will be discussed below and results in the debtor losing his discharge.

There is, however, a difference between transferring assets with the intent to hinder, delay, or defraud creditors and a willful and malicious injury targeted at a specific creditor. At trial, Helena Chemical did not focus on the disposition of its collateral; the record is simply devoid of specifics other than the generalization that the collateral, if it had the value as listed on the debtor's 2006 Balance Sheet, is no longer there. Again, that fact coupled with the attendant disposition of other equipment to 2WinFarms, LLC right before bankruptcy has consequences with respect to the debtor's general discharge. It does not, however, suffice for a full exposition and development of facts and circumstances justifying this court to find that the debtor willfully

and maliciously targeted and intended to injure Helena Chemical.  Accordingly, the section 523(a)(6) count is denied.

### D.  11 U.S.C. § 523(a)(4)

Section 523(a)(4) of the Bankruptcy Code specifically provides that a debtor is not entitled to a discharge from any debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny."[30]  In its Complaint, Helena Chemical alleges that the debtor, acting as the president [sic] and manager of Richmond Company, owed a fiduciary duty to the company and its creditors to preserve the company's assets. (Compl. at 7, ¶ 38.)  In addition, Helena Chemical asserts that the debtor, "acting in concert with Vic Richmond and others, participated in a series of transactions, . . . that rendered Richmond & Company unable to satisfy its obligations to its creditors, such as HCC" and such action constituted fraud or defalcation on its creditors. (Compl. at 8, ¶¶ 39-40.)

To establish a claim for relief under section 523(a)(4), Helena Chemical must prove the following elements by a preponderance of the evidence: "(1) that a fiduciary relationship existed [between the debtor and Helena Chemical]; and (2) that [the debtor] committed fraud or defalcation in the course of the fiduciary relationship." *Jafarpour v. Shahrokhi* (*In re Shahrokhi*), 266 B.R. 702, 707 (B.A.P. 8th Cir. 2001) (citations omitted); *see Yang v. Qin* (*In re Qin*), 285 B.R. 292, 296-97 (Bankr. N.D. Iowa 2002).  Helena Chemical failed to satisfy its burden under section 523(a)(4).

"The definition of 'fiduciary' for purposes of § 523(a)(4) is a question of federal law."

---

[30] Helena Chemical does not allege that the debtor embezzled funds or committed larceny.  As such, those grounds will not be analyzed.

56

*Freier*, 402 B.R. at 899. The Eighth Circuit Court of Appeals has narrowly defined the term to include only those trustees of "express trusts." *Id*; *Hunter v. Philpott*, 373 F.3d 873, 875-76 (8th Cir. 2004) (citing *Long*, 774 F.2d at 878 (quoting *Davis v. Aetna Acceptance Co.,* 293 U.S. 328, 333 (1934))). The fiduciary relationship must "pre-exist 'the incident creating the contested debt and apart from it. It is not enough that the trust relationship spring[s] from the act from which the debt arose.'" *Hunter*, 373 F.3d at 877 (citation omitted).

Based on this narrow definition, neither a constructive trust nor a relationship formed on "confidence, trust, and good faith" applies in the dischargeability context. *Id.* at 876. (citation omitted). In determining whether a fiduciary relationship exists for purposes of section 523(a)(4), the court will examine "the substance of the transaction." *Id.* (citing *Long*, 774 F.2d at 878). "A merely contractual relationship is less than what is required to establish the existence of a fiduciary relationship." *Shahrokhi*, 266 B.R. at 708 (holding that a lease agreement between the parties established a contractual rather than fiduciary relationship); *Day v. Tri-State Chem. Inc.*, 165 F. Supp. 2d 830, 834 (E.D. Ark. 2001) (finding that the parties' arms-length negotiations resulted in a buyer-seller relationship rather than a fiduciary relationship). "Unless the parties intended a trust, defined a trust res, and gave specific duties regarding the trust funds or unless a statute imposes a trust, the fiduciary relationship contemplated in § 523(a)(4) does not extend to financing arrangements or security agreements." *Qin*, 285 B.R. at 297 (holding that the relationship between the debtor and his creditor was merely a lender-borrower relationship which varied significantly from a trustee who receives and holds property solely for the benefit of a beneficiary) (citation omitted); *see Bybee v. Geer* (*In re Geer*), 137 B.R. 37, 40 (noting that "[o]rdinary commercial relationships are excluded from the reach of § 523(a)(4)").

Though the definition of a "fiduciary" is a question of federal law, courts often "look to state law to determine whether a fiduciary [relationship] exists." *Qin*, 285 B.R. at 297. Arkansas courts analyze the "factual underpinnings" of a case to determine if a fiduciary relationship exists. *Knox v. Regions Bank*, 286 S.W.3d 737, 741 (Ark. Ct. App. 2009); *Mans v. Peoples Bank of Imboden*, 10 S.W.3d 885, 889 (Ark. 2000) (emphasizing the importance of the "factual underpinnings [necessary] to establish a relationship of trust between a bank and its customers, which is more than a debtor-creditor relationship"). Generally, a "[b]reach of fiduciary duty involves betrayal of a trust and benefit by the dominant party at the expense of one under his influence." *Cole v. Laws*, 76 S.W.3d 878, 883 (Ark. 2002) (citation omitted).

Helena Chemical failed to establish the requisite fiduciary or trust relationship. The proof demonstrates nothing more than a standard debtor/creditor relationship with no evidence of an express trust or fiduciary relationship between the debtor individually and Helena Chemical. Accordingly, the court need not consider the issue of fraud or defalcation. The §523(a)(4) count is denied.

### E.  11 U.S.C. § 727(a)(2)

The fifth cause of action contained in Helena Chemical Company's Complaint is for fraudulent transfer or concealment of property pursuant to 11 U.S.C. § 727(a)(2). Section 727(a)(2) provides as follows:

> (a) The court shall grant the debtor a discharge, unless-
>> (2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated or concealed-
>>> (A) property of the debtor, within one year before the date of the filing of the petition[.]

This section is fundamental to the concept of the honest but unfortunate debtor who surrenders his non-exempt assets in a chapter 7 and obtains his discharge, all on the premise that he has played by the rules and fairly made his assets available for distribution. "Section 727(a)(2) is intended to prevent the discharge of a debtor who attempts to avoid payment to creditors by concealing or otherwise disposing of assets." 727 COLLIER ON BANKRUPTCY § 727.02 n.1 (rev.15th ed. 2009). The burden of proof to sustain an objection to discharge is on the plaintiff. FED. R. BANKR. P. 4005. "[P]roof of harm is not a required element of a cause of action under Section 727." *In re Snyder*, 152 F.3d 596, 601 (7th Cir. 1998) (citing *Smiley v. First Nat'l Bank of Belleville* (*In re Smiley*), 864 F.2d 562, 569 (7th Cir. 1989)).

To succeed on a 727(a)(2)(A) claim, the objecting creditor must prove by a preponderance of the evidence:

> (1) that the act complained of was done within one year prior to the date of petition filing;
> (2) the act was that of the debtor;
> (3) it consisted of a transfer, removal, destruction, or concealment of the debtor's property; and
> (4) it was done with an intent to hinder, delay, or defraud either a creditor or an officer of the estate.

*Korte v. U.S. Internal Revenue Serv.* (*In re Korte*), 262 B.R. 464, 472 (B.A.P. 8th Cir. 2001) (citing *Kaler v. Craig* (*In re Craig*), 195 B.R. 443, 448 (Bankr. D. N.D. 1996)).

Helena Chemical has met its burden of proof on this claim relative to items of equipment and land owned by the debtor. Specifically:

-EQUIPMENT: On his 2006 Balance Sheet, the debtor reported total intermediate farm assets of $408,250, comprised of three figures: $83,400 in vehicles (trucks, etc.), $76,350 in other vehicles, and $248,500 in machinery and equipment, all as of

59

March 22, 2006, and all as against total intermediate farm liabilities of $20,850.

Thus, the debtor had equity of $387,400 as of March 22, 2006, or approximately 18

months before he filed his petition.

-The debtor filed his chapter 7 petition on September 13, 2007.  His personal

property schedule totals $50,747.67 (Ex. 197 at 5114), of which $1000 is machinery,

$31,100 is farming equipment and implements (to be surrendered to Delta Bank and

Helena Chemical), and $3900 is vehicles, for a subtotal of $36,000 in vehicles,

machinery, and equipment. (Ex. 197 at 5111-14.)  The debtor also exempted a truck

and trailer valued at $1250.  Thus, in the eighteen months prior to bankruptcy,

$350,150 in equity disappeared.

-The assets are listed as jointly held on his bankruptcy schedules; however, the 2006

Balance Sheet does not reflect joint ownership.  The debtor, at trial, was unable to

explain the significant diminution of his intermediate farm assets between March 22,

2006, and the date of filing, September 13, 2007, a period of eighteen months.

-On his Statement of Financial Affairs, the debtor had to report all transfers of

property (including for security) within the two years prior to bankruptcy. (Ex. 197

at 5154.)  This disclosure reflects that he transferred his one-half interest in

seventeen items of equipment, including ten vehicles, for $3100; the transfer

occurred on September 10, 2007, three days before the debtor filed his chapter 7

petition.  The transfer was to 2Winfarms, LLC, an entity owned by his son, Vince

Richmond, and the debtor's granddaughter, Laura Jill Richmond, set up solely to

own and lease equipment.  Vince Richmond testified that he purchased some

60

property on behalf of 2WinFarms, LLC, but he never directly referenced the equipment sold by the debtor. He stated that he purchased some equipment "later in the summer" for less than $10,000 because he had to pay off Ford Motor Credit. The debtor's schedules reflect September 10, 2007 as the date of the sale to 2WinFarms, LLC.

-Thus, $350,150 in equity disappeared in the eighteen months before bankruptcy. The diminution is not explained by any transfers, sales, or grants of security within the two years prior to bankruptcy, a period encompassing the March 22, 2006 Balance Sheet.  The only reported disposition is an undivided one-half interest in 17 items of equipment for $3100.  Taking the 2006 Balance Sheet as correct, the debtor has either concealed substantial equipment, has failed to disclose significant transfers, or transferred equipment to family members for inadequate consideration only three days before filing his petition.

-LAND:  The debtor's March 22, 2006 Balance Sheet reflected long-term farm assets of $1,130,250, comprised of a 612 acre tract worth $918,000, improvements of $147,250, and other long-term assets of $65,000. (Ex. 29.)  The only disclosed obligation against long-term assets was a MONY mortgage of $442,000 on the 612 acre tract, thus leaving $476,000 in equity. (Ex. 29.)  On his schedule A, the only real property interest the debtor lists is a $12,500 value in his homestead owned jointly with his wife. (Ex. 197 at 5110.)  The 2006 Balance Sheet does not reflect that the debtor had only a one-half interest in the 612 acre tract.

-The debtor, in his schedules, discloses a transfer of his one-half interest in the 606

acres[31] on June 25, 2007, for $20,000. (Ex. 197 at 5154.)  Again, the transferee is

2Winfarms, LLC.  The purchaser paid the debtor his $20,000 but has yet to pay the

debtor's wife an equal amount.  The debtor and his wife transferred approximately

$476,000 in equity to an LLC owned by their son and granddaughter for a total of

$40,000, half of which has not been paid.

-The debtor's schedules reflect that the property was transferred to 2Winfarms, LLC.

However, the testimony of Vic Richmond and the debtor is that the land was

possibly transferred to TLM Land, LLC, not 2Winfarms, LLC.  Since the testimony

presented at trial does not correspond to the debtor's verified schedules, the court,

like the debtor and Vic Richmond, is uncertain who now owns the 606 acres of land.

For purposes of this opinion, the court accepts the debtor's schedules that reflect

2Winfarms, LLC as the owner.  Ambiguity does not favor the debtor in this instance.

-The debtor testified that at or about the time he filed bankruptcy, he may have

pledged the same property to Delta Bank to help it, in an unspecified manner, with

bank examiners.  Regardless, that transaction is not reflected on his schedules. *See*

debtor's Statement of Financial Affairs, Ex. 197 at 5154, Question 10.

-Additional ambiguity exists with reference to the Rabo AgriFinance transaction.

The debtors Schedule D reflects a secured claim to this creditor on two tracks of 406

and 194 acres, with debt of $266,655.53 and $153,260.67 respectively.  But, again,

there is no disclosure of a transfer for security in the period from his 2006 Balance

---

[31] The court may infer that the difference between the 606 and 612 acre descriptions is the homestead carved out for the debtor, as the original 2006 Balance Sheet does not have a separate entry for the homestead.

Sheet to the filing of his petition. (Ex. 197 at 5154.)

The debtor, within one year of his filing, concealed, and continues to conceal, or transferred substantial assets. The remaining question under §727(a)(2) is whether the debtor concealed or transferred the assets with the intent to hinder, delay, or defraud his creditors or an office of the estate.

The evidence compels the conclusion that the debtor concealed assets or made transfers of property, individually and in the aggregate, with the actual intent to hinder, delay, and defraud his creditors, including Helena Chemical, and with the purpose of denying the chapter 7 trustee equity that would have increased the distribution to creditors. "In terms of the fourth element, while the objecting creditor need not show fraudulent intent on the debtor's part to succeed on a § 727(a)(2)(A) claim, it must show the debtor acted with actual intent to hinder, delay, or defraud a creditor." *Korte*, 262 B.R. at 472; *see Fox v. Schmit* (*In re Schmit*) 71 B.R. 587, 590-91 (Bankr. D. Minn. 1987). "A discharge may not be denied pursuant to section 727(a)(2) unless the court finds actual intent to hinder, delay, or defraud creditors; constructive intent is insufficient." *Pher Partners v. Womble* (*In re Womble*), 289 B.R. 836, 853 (Bankr. N.D. Tex. 2003).

The court may infer the requisite intent. "Proving the requisite actual intent with direct evidence is difficult. Thus such actual intent may be 'inferred from the facts and circumstances of the debtor's conduct.'" *Korte*, 262 B.R. at 473; *see Schmit,* 71 B.R. at 590. Determination of the debtor's intent requires a two-part inquiry. "First, the debtor's actual intent must be found as a matter of fact from the evidence presented." *Bold City VII, Ltd. v. Radcliffe* (*In re Radcliffe*), 141 B.R. 1015, 1019 (Bankr. E.D. Ark. 1992) (citing *Ray v.*

63

*Graham* (*In re Graham*), 111 B.R. 801, 805 (Bankr. E.D. Ark. 1990)).  "The second prong

of the inquiry involves a determination, as a matter of law, whether the demonstrated intent

constitutes the intent proscribed by the statute." *Id.*

The following factors should be considered when determining whether a debtor

acted with the intent to hinder, delay, or defraud:

1. lack or inadequacy of consideration;
2. family, friendship or other close relationship between transferor and transferee;
3. retention of possession, benefit or use of the property in question;
4. financial condition of the transferor prior to and after the transaction;
5. conveyance of all the debtor's property;
6. secrecy of the conveyance;
7. existence of trust or trust relationship;
8. existence or cumulative effect of pattern or series of transactions or course of conduct after the pendency or threat of suit;
9. instrument affecting the transfer suspiciously states it is bona fide;
10. debtor makes voluntary gift to family member; and
11. general chronology of events and transactions under inquiry.

*First State Bank of Munich v. Braathen* (*In re Braathen*), 364 B.R. 688, 697 (Bankr. D. N.D.

2006) (citing *MWI Veterinary Supply Co. v. Rodgers* (*In re Rodgers*), 315 B.R. 522, 531

(Bankr. D. N.D. 2004)).

The debtor transferred 606 acres within three months of filing bankruptcy; he

transferred most of his vehicles and equipment three days prior to filing bankruptcy.  Both

transfers were to an LLC owned jointly by his son, Vince Richmond, and granddaughter.

The evidence at trial indicated that this entity was set up solely to own and lease equipment.

The equipment did not travel far from the Richmond family or the property

Richmond Company traditionally farmed.  For approximately $100 a week, the debtor now

works for Farm Manager, LLC, an entity comprised of Jill Richmond, Vic Richmond, Case

Richmond (Vic Richmond's son), and Laura Richmond (Vic Richmond's daughter).  Farm

Manager, LLC employs Vic Richmond. DV Farm Group, a farming entity controlled by Vince Richmond, Vic's brother and the debtor's other son, began farming the four Richmond Company farms in Jefferson County in 2007, and, in 2008, some of the JSR farmland in Phillips County. To manage these properties, DV Farm Group hired Farm Manager, LLC. Vic Richmond is accordingly the manager of the old JSR and Richmond Company farms. Vic Richmond, Vince Richmond, and the debtor have signatory authority on the bank accounts used by the related entities. DV Farm Group uses the equipment that the debtor transferred to 2Winfarms, LLC, the entity owned by Vince Richmond and Laura Jill Richmond, who contributed no capital for her 50% ownership. 2Winfarms, LLC was developed to lease equipment, including equipment purchased from the debtor, to all the Richmond entities. Richmond Gin also uses 2Winfarms, LLC equipment in performing custom hauling.

The debtor transferred these assets on the eve of bankruptcy for minimal consideration. If there are assets not disclosed in the 2Winfarms, LLC transaction, then the debtor has concealed assets up to and after the filing of his petition. Without adequate explanation, equity of $350,150 in vehicles and farm equipment disappeared, with the only transfer– absolute or as security– acknowledged in his schedules in the two years prior to bankruptcy being the transfer to 2Winfarms, LLC, three days prior to the debtor filing his petition. Notwithstanding the fact that the debtor contends, in his schedules, that he had only a half-interest in the equipment, a disclosure not made in the 2006 Balance Sheet, the debtor gave up his one-half for a mere $3100.

Equally significant, the debtor gave up $476,000 in equity in the over 600 acre tract

for $20,000, again to 2Winfarms, LLC, a purchaser who paid the debtor his $20,000 but has

not paid the debtor's wife her like amount.  The Rabo AgriFinance transaction is not

referenced in the 2006 Balance Sheet or adequately disclosed in the debtor's schedules.

Now, 2Winfarms, LLC, meaning the Richmonds, and the debtor are all back to farming the

same JSR and Richmond Company farms, using the same equipment previously owned by

the debtor.

This is consistent with how the Richmond family operates and does business.  Their

actions, including those of the debtor, are characterized by a self-centered desire to maintain

unrealistically high living standards, whether by disguised compensation or simply

plundering the assets of their farm entities, coupled with tax avoidance, followed by

continued survival in thinly-disguised new entities, all to the detriment of their creditors and

this estate.  The debtor acted in a manner clearly within the purview of many of the

*Braathen* factors.  The debtor transferred or concealed assets with the intent to hinder,

delay, or defraud his creditors, including Helena Chemical, and his chapter 7 trustee.  The

debtor's discharge is denied under section 727(a)(2).

### F.  11 U.S.C. § 727(a)(3)

Helena Chemical also seeks to deny the debtor's discharge pursuant to 11 U.S.C.

section 727(a)(3), which provides as follows:

> (a) The court shall grant the debtor a discharge, unless-
>     (3) the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or
>     preserve any recorded information, including books, documents, records, and
>     papers, from which the debtor's financial condition or business transactions
>     might be ascertained, unless such actor or failure to act was justified under all of
>     the circumstances of the case[.]

11 U.S.C. § 727(a)(3) "ensures that the debtor will disclose to the parties in interest

his pre-bankruptcy financial condition." *Grisham Farm Prod., Inc. v. Keller* (*In re Keller*), 322 B.R. 127, 133 (Bankr. E.D. Ark. 2005) (citing *Aid Auto Stores, Inc. v. Pimpinella* (*In re Pimpinella*), 133 B.R. 694, 697 (Bankr. E.D. N.Y. 1991)).  "Under this statute, the debtor has an affirmative duty to create records accurately documenting his financial affairs." *Smith v. Cooper* (*In re Cooper*), 399 B.R. 637, 644 (Bankr. E.D. Ark. 2009) (citing *Peterson v. Scott* (*In re Scott*), 172 F.3d 959, 969 (7th Cir. 1999)).  "The Code requires written evidence from which the debtor's financial condition may be ascertained." *Id*. (citing *Christy v. Kowalski* (*In re Kowalski*), 316 B.R. 596, 601 (Bankr. E.D. N.Y. 2004)).  "In prosecuting an objection under subsection 727(a)(3), the burden is on the objecting party to show that the debtor has failed to keep or preserve sufficient and/or accurate records which would reflect the recent financial condition of the debtor." *Anderson v. Wiess* (*In re Wiess*), 132 B.R. 588, 592 (Bankr. E.D. Ark. 1991) (citing FED. R. BANKR. P. 4005).

Helena Chemical failed to meet its burden of proof under this section.  The proof at trial dealt almost exclusively with the books and records of Richmond Company, not the debtor's books and records.  Helena Chemical directed less effort at proving the debtor's books and records as inadequate or fraudulent than in using the same books and records to demonstrate that the debtor acted in a fraudulent manner, most notably with respect to the disposition of assets.  Accordingly, the Complaint is denied with respect to 11 U.S.C. §727(a)(3).

### G.  11 U.S.C. § 727(a)(4)

Helena Chemical also seeks denial of the debtor's discharge pursuant to section 727(a)(4)(A), which provides as follows:

      (a) The court shall grant the debtor a discharge, unless-
         (4) the debtor knowingly and fraudulently, in or in connection with the case-
           (A) made a false oath or account[.]

To deny a discharge under 11 U.S.C. § 727(a)(4)(A), the plaintiff must establish the

following elements:

    1.  the debtor made the statement under oath;
    2.  the statement was false;
    3.  the statement was made with fraudulent intent;
    4.  the debtor knew the statement was false; and
    5.  the statement related materially to the debtor's bankruptcy.

*Cooper*, 399 B.R. at 646 (citing *Jacoway v. Mathis* (*In re Mathis*), 258 B.R. 726, 735

(Bankr. W.D. Ark. 2000)).

    "For such a false oath or account to bar discharge, the false statement must be both

material and made with intent." *Korte*, 262 B.R. at 474; *see Mertz v. Rott*, 955 F.2d 596,

597-98 (8th Cir. 1992); *Palatine Nat'l Bank v. Olson* (*In re Olson*), 916 F.2d 481, 483-84

(8th Cir. 1990); *Chalik v. Moorefield* (*In re Chalik*), 748 F.2d 616, 618 (11th Cir. 1984).

"The subject matter of a false oath is 'material' and thus sufficient to bar discharge, if it

bears a relationship to the bankrupt's business transactions or estate, or concerns discovery

of assets, business dealings, or the existence and disposition of his property." *Korte*, 262

B.R. at 474 (citing *Cepelak v. Sears (In re Sears)*, 246 B.R. 341, 347 (B.A.P. 8th Cir.

2000)).  "Materiality of a false oath does not depend upon whether the falsehood is

detrimental to creditors." *Sergent v. Haverland* (*In re Haverland*), 150 B.R. 768, 771

(Bankr. S.D. Cal. 1993) (citing *Allard v. Hussan* (*In re Hussan*), 56 B.R. 288, 290 (Bankr.

E.D. Mich. 1985)).  "An omission of a relatively modest asset will merit denial of discharge,

if done with knowledge and fraudulent intent." *Sears*, 246 B.R. at 347 (citing *Mertz*, 955

F.2d at 598).

"Intent 'can be established by circumstantial evidence,' and 'statements made with reckless indifference to the truth are regarded as intentionally false.'" *Korte*, 262 B.R. at 474 (citing *Golden Star Tire, Inc. v. Smith* (*In re Smith*), 161 B.R. 989, 992 (Bankr. E.D. Ark. 1993)). "The [p]laintiff bears the burden of proof to establish fraudulent intent." *Ellsworth v. Bauder* (*In re Bauder*), 333 B.R. 828, 832 (B.A.P. 8th Cir. 2005) (citing *Floret, LLC v. Sendecky* (*In re Sendecky*), 283 B.R. 760, 762 (B.A.P. 8th Cir. 2002)). "The intent must be actual not constructive, but intent may be proven by circumstantial evidence or by inferences drawn from course of conduct." *Ramsay v. Jones* (*In re Jones*), 175 B.R. 994, 1002 (Bankr. E.D. Ark. 1994) (citing *McCormick v. Sec. State Bank*, 822 F.2d 806, 808 (8th Cir. 1987); *Pereira v. Checkmate Commc'n Co.* (*In re Checkmate Stereo & Elecs., Ltd.*), 9 B.R. 585 (Bankr. E.D. N.Y. 1981)).

Helena Chemical has met its burden of proof in this regard. It is apparent to this court that the debtor's schedules and the 2006 Balance Sheet are irreconcilable. In fact, the 2006 Balance Sheet establishes a baseline against which the schedules are compared, thus proving a significant and unexplained diminution of assets. The verified schedules wholly fail to either (1) disclose the existence of concealed assets or (2) adequately explain transfers of these assets in the period prior to bankruptcy. Accordingly, the debtor is denied his discharge pursuant to section 727(a)(4)(A).

### IV. Conclusion

For the reasons stated herein, and pursuant to 11 U.S.C. § 727(a)(2) and (a)(4)(A), the court denies the debtor his discharge. Alternatively, the specific indebtedness to Helena

69

Chemical is nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(A) and (B).  Helena

Chemical is entitled to a judgment against the debtor on his guarantee in the amount of

$732,236.36 in principal and interest as of October 28, 2009, plus costs and interest as it

accrues at the highest rate allowed by law.  A separate judgment will be entered consistent

with the findings and conclusions stated herein.

Further, a copy of this opinion will be sent to the United States Attorney for the

Eastern District of Arkansas for her consideration.

IT IS SO ORDERED.

Dated this 8th day of June, 2010.

_____
RICHARD D. TAYLOR
U.S. BANKRUPTCY JUDGE

EOD 6/8/2010
by L Martindale

cc:    Robert J. Gibson, Attorney for Helena Chemical
       Vaughn Knight, Attorney for the Debtor
       Robert W. Richmond, Debtor
       A. Jan Thomas, Jr., Chapter 7 Trustee
       Ralph W. Waddell, Attorney for Helena Chemical